**Pedro DE LA FUENTE et al., Plaintiffs,**

**v.**

**STOKELY–VAN CAMP, INC., et al., Defendants.**

**No. 78–0090.**

United States District Court, C. D. Illinois.

March 27, 1981.

Ezequiel Tovar and F. Thomas Hecht, Illinois Migrant Legal Assistance Project, Dodge Wells, Chicago, Ill., for plaintiffs.

Michael Scott, Justice Dept., Washington, D.C., for Federal Defendants except Department of Labor.

Pat Duryee, Dept. of Labor, General Legal Office, Washington, D.C., for Department of Labor.

Herb Snyder and James D. Moore, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., John Jenkins, Gunn, Hickman, Kesler & Jenkins, Danville, Ill., for defendants Solis and Stokely-Van Camp.

Richard R. Haldeman, Williams, McCarthy, Kinley, Rudy & Picha, Rockford, Ill., Hardin Hawes, Sebar, Swanson, Banks, Lessen & Garman, Danville, Ill., for defendant Marcelino Vasquez.

## MEMORANDUM OPINION

BAKER, District Judge.

In this suit for declaratory and injunctive relief and for money damages, the plaintiffs, who are migrant agricultural workers, claim that the private defendants have violated the provisions of three federal stat-

utes[1] and thereby damaged the plaintiffs. The private defendants are farm labor contractors, their employees, and a producer of agricultural products. The plaintiffs claim only injunctive and declarative relief against the public defendants, The United States Department of Transportation, the Secretary of Transportation and the Region V representative of the Department. Those claims are dealt with in the last part of this opinion.

Jurisdiction is vested in the court under 28 U.S.C. §§ 1331, 1337, and 1361.[2]

## FINDINGS OF FACT

### PLAINTIFFS

The plaintiffs, Pedro De La Fuente, Oscar De La Fuente, Emilio De Leon, Manuel Garza and Anselmo Solis are residents of the State of Texas. Spanish is the plaintiffs' primary language.

On June 12, 1979, pursuant to *Fed.R. Civ.P.* 23(b)(2) the plaintiffs were permitted to maintain their action against the private defendants for injunctive relief as a class on behalf of:

Class I: All persons who have been recruited since January 1, 1977 or will have been recruited through the Interstate Recruitment System by defendants, Stokely-Van Camp Inc., Albert Solis and Marcelino Vasquez for work in Illinois.

Class II: All migrant workers who have been employed since January 1, 1977 or will have been employed by defendant, Stokely, in Illinois and who allegedly have been transported or will have been transported by defendants, Stokely-Van Camp, Inc. or Marcelino Vasquez, within the meaning of the I.C.A., 49 U.S.C. § 10101 et seq. or the DOT Act, 49 U.S.C. § 1651 et seq.

1. 7 U.S.C. § 2041 *et seq.* (FLCRA).
   29 U.S.C. § 49 *et seq.* (Wagner-Peyser Act).
   49 U.S.C. § 1651 (DOTA).

2. The plaintiffs have also asserted jurisdiction under 28 U.S.C. § 1343(3) and (4). The short answer to that assertion is that the Farm Labor Contractor Registration Act, the Wagner-Peyser Act, and the Department of Transportation

The plaintiffs were also allowed to proceed as a sub-class and seek monetary damages against the private defendants as:

All persons who were recruited in Texas in 1977, 1978 and 1979 through the Interstate Recruitment System for work at Stokely-Van Camp, Inc.'s Illinois operations.

### DEFENDANTS

The defendant Stokely-Van Camp, Inc. is an Indiana corporation licensed to do business in the State of Illinois. Its business activities in Illinois include the harvesting, processing, and packaging of agricultural products. The defendant Albert Solis is a resident of Mercedes, Texas. During 1977 and 1978 he was a year round employee of Stokely and in 1979 and 1980 was employed by Stokely on a seasonal basis. Solis' job was to recruit workers in Texas for Stokely's operations in Illinois. The defendant Marcelino Vasquez is a resident of Pharr, Texas and is a registered farm labor contractor. Vasquez has been employed by Stokely as a crew leader on a seasonal basis from 1977 to the present.

The defendant Stokely in its Illinois operations engages in the harvesting, processing, and packaging of sweet corn, lima beans, asparagus, and pumpkin. Stokely maintains canning facilities at Rochelle, Gibson City and Hoopeston, Illinois and in conjunction with those facilities operates migrant labor camps. The harvesting and canning season for Stokely's products begins, depending on the weather, in late April and extends through late September.

### STOKELY'S RELATIONSHIP WITH CREW LEADERS

The relationship between Stokely and its crew leaders is typified by the relationship between Stokely and Vasquez. During har-

Act are not "Acts of Congress providing for equal rights" which would give rise to jurisdiction under 28 U.S.C. § 1343(3) or "an Act of Congress protecting civil rights where jurisdiction could be found under 28 U.S.C. § 1343(4). See *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

vest and packing Vasquez is an employee of Stokely. He is on the corporation payroll and subject to Stokely's control and immediate direction. During the periods when harvest and packing are not in progress, Vasquez, while he is not an employee, is still an agent. He recruits workers and holds his crew together ready to perform services for Stokely at its request. His acts as a recruiter are still subject to the control and direction of Stokely even though Vasquez is only on the payroll during canning and harvesting. There is no question that Stokely has the right to terminate Vasquez' services at any time if Stokely is dissatisfied with the way the services are rendered.

Stokely uses Vasquez, his equipment and employees, to transport migrant workers who perform services for Stokely. During the harvest and packing season the transported workers are Stokely employees and so are the crew leaders and their employees. Stokely advances funds to crew leaders to transport workers from Texas to Illinois. Stokely advances funds to crew leaders for vehicle insurance and inspection costs and pays crew leaders a per diem rate for the use of their vehicles during harvest and packing season.

*MIGRANT WORKER RECRUITMENT PROCEDURES*

In 1977, 1978, 1979 and 1980 Stokely recruited the plaintiffs and the members of their class in Texas to work in Stokely's agricultural business operations in Illinois. The defendant Stokely carried out its recruitment operations through its employee, the defendant Solis, and through its crew leaders.

To recruit workers for its operation Stokely uses the Interstate Recruitment System established under the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.* In each of the years, 1977, 1978, 1979 and 1980, which are the times in question in this case, Stokely prepared and submitted clearance orders to the Illinois State Employment Service [ISES] describing the type of work, the remuneration, the working conditions, and the number of employees required. The proposed clearance orders after they had

passed inspection at the ISES were forwarded to the appropriate federal officials in the Department of Labor and upon approval they were returned to ISES which forwarded the completed clearance order to the Texas Employment Commission [TEC].

Stokely's recruiters, the defendants, Albert Solis, Marcelino Vasquez, and other crew leaders employed by Stokely, Ricardo Banda, Juan Robles, Candelario Palomo, and Fidencio Salinas would begin to contact migrant workers interested in coming to Illinois to work for Stokely. [Stokely also employed as crew leaders Eugenio Mendoza in 1978 and Guadalupe Santillana in 1978 and 1979.]

In addition to the clearance orders Stokely prepared an ISES form 560–C as required by Illinois law [Ill.Rev.Stat. ch. 48, § 184.1] describing the terms and conditions of employment. The form 560–C was both in Spanish and in English. The clearance order was in English only. Eighty percent of the migrant workers recruited by Stokely do not speak or read English.

Each year prior to recruitment, Stokely sent employee representatives to Texas to meet with the defendant, Solis, and the crew leaders to exchange information as to the number of workers needed and the working conditions for the coming year. In 1977 Maurice Schellhardt, district manager of Stokely, and Robert Shelton, personnel manager at Stokely's Gibson City plant, went to Texas to assist Solis in recruitment. In 1978 Maurice Schellhardt, Robert Shelton and Dennis David, Stokely's personnel manager at Hoopeston, went to Texas to assist in the recruitment. In 1979 Robert Shelton, Dennis David and Benjamin Scott went to Texas as Stokely representatives to assist in the recruitment. In 1980 Maurice Schellhardt and Dennis David were the Stokely representatives in Texas.

Asparagus is the first crop of the season to be picked and processed and, as the date for that harvest approaches, Stokely gives notice to ISES of the departure date on which Stokely wishes the migrant workers to leave Texas for Illinois. ISES informs TEC which in turn informs the defendant

Solis of the date of departure and he begins to gather the workers for that event. On or about the date of departure, final processing is carried out. Solis completes the workers' forms for insurance coverage, disburses travel and food allowances, has the workers execute an Employment, Housing and Transportation Agreement and distributes copies of the clearance orders, the forms 560–C, a statement of insurance coverage, and the Employment Housing and Transportation Agreement. Solis signs all contract documents as the representative of Stokely.

Between 1977 and 1980 according to Solis' testimony, which I credit, Stokely recruited, on the average, 380 migrant farmworkers per year to come from Texas to Illinois to work in Stokely's Illinois operations. The number recruited ranged from 450 in 1977 to 315 in 1980.

## INTERIM EMPLOYMENT ARRANGEMENTS

In the years 1977, 1978 and 1979 the clearance orders promulgated by Stokely stated that Stokely would make efforts to develop jobs for its migrant workers with local employers in the idle periods between field work and cannery work.

In 1977, 1978, 1979 and 1980 Stokely did request Illinois seed corn companies to provide certain minimum terms of employment for interim employment offered by those companies to plaintiffs and members of their class residing in Stokely's housing. [See plaintiff's exhibit 59.] In each of those years Stokely received payments from employers who used the services of the migrant workers during their idle periods. Stokely used the payments to defray, in part, its expenses in providing housing to the workers during the period they were not engaged in harvesting and canning Stokely products. In 1977 Stokely received $2,439.15 in payments from local employers. In 1978 Stokely received $2,776.53. In 1979 Stokely received $1,221.25. The payments did not cover Stokely's expenses for maintaining the housing in the idle periods. Housing expenses were between $3.50 and $4.00 per man per day. Stokely realized

about 80¢ per man per day on the payments received.

The fact that Stokely received these payments was not disclosed to workers in the 1977, 1978, or 1979 clearance orders. The 1980 clearance order did disclose to workers that some local farmers made payments which were used to defray Stokely's housing expenses. Seed corn companies in the area of Stokely's Hoopeston operation paid 20¢ per hour for each hour worked by migrant workers living in Stokely's housing during the interim period between harvests in 1980. No such payments were received by Stokely from its Gibson City or Rochelle operations. The exact amount received by Stokely in 1980 is not revealed by the evidence.

## ASPARAGUS DOCKAGE POLICY

In 1977, 1978, 1979 and 1980 Stokely paid its asparagus pickers at a piece work rate or a guaranteed minimum wage whichever was greater. The piece work rate varied from field to field. An asparagus picker works a row and, at the end of the row, when his basket is full of asparagus, he has the basket weighed by a Stokely employee and dumped in a common box, 48″ × 44″ × 48″, holding the asparagus picked by the worker's crew. The weight of the asparagus snapped by each worker is recorded under the worker's name in the field.

The total produced from each field is taken to the cannery where the amount of useable asparagus is determined. The asparagus from each field is reweighed at the cannery. If a weight differential greater than 5% exists, the total weight recorded for each worker who worked in the field for that day is reduced by the difference in excess of 5%. At the cannery, Stokely also takes a sample from each field's produce and removes from that sample low-grade asparagus and any inedible materials such as stones or sticks. If the reduced weight of the sample exceeds 10% of the amount picked, then the total weight recorded for each worker is reduced by the difference in excess of the 10% for grade allowance. Each worker's piece rate earnings are then calculated based upon the total amount of

useable asparagus picked by each worker remaining after the weight and grade reductions.

The reductions in weight for grade allowance and error in field weighing were not revealed to the workers in the clearance order or in the form 560–C. There is no credible evidence that shows that the crew leaders or Albert Solis explained the weighing, sorting and grading process to the workers at recruitment. There is some evidence that information concerning the dockage policy was posted in a field letter in the personnel office of Stokely and in the labor camps. I am unable to say from the evidence whether the field letter was posted or not. But it seems indisputable that the field letter was not "conspicuous" within the intent of FLCRA, 7 U.S.C. § 2045(b), and that the migrant workers were not aware of the letter and that they did not receive effective notice of the dockage policy.

## COMMISSIONS TO CREW LEADERS

In each of the years 1977, 1978, 1979 and 1980 the defendant Vasquez received commissions from hybrid seed corn companies that employed Vasquez' crew in the idle periods between the harvesting and packing of the various Stokely products. The commissions were paid Vasquez for providing and supervising his crew for the hybrid seed corn companies.

Stokely paid its crew leaders 10¢ for every hour of work performed by crew members during in-plant work operations. These payments to the crew leaders by Stokely were not disclosed to the workers in written Spanish at the time they were recruited in Texas. Neither does the evidence support an assertion that the workers were informed in any other way about the 10¢ an hour paid to crew leaders during canning operations.

## TRAVEL FROM TEXAS TO ILLINOIS

At the time of recruitment in Texas the plaintiffs and each member of the class were given the right to choose the method of transportation from Texas to Illinois. A worker could come by his own conveyance, could take commercial transportation, or could ride with the crew leader if the worker chose. An advance against transportation and food while enroute was made to each migrant worker by Stokely through Solis. The advance for transportation and food was to be deducted from the wages of plaintiffs and their class members in Illinois. This fact is established unequivocally by the testimony of the witnesses, Schellhardt, Solis and Vasquez and by the provisions of the Stokely Employment, Housing and Transportation Agreement, plaintiff's exhibit 55, and defendant Stokely's exhibits 27, 28 and 29.

*Transport to Illinois by Crew Leaders* During 1977, 1978 and 1979, a small percentage of Stokely's total migrant work force was transported to Illinois in vehicles operated by Vasquez and other crew leaders. There is testimony on behalf of the plaintiffs about infrequent stops and little rest being afforded the migrant workers who were passengers, but there is counter balancing testimony on behalf of the defendants that the transportation afforded by Vasquez was without complaint or incident.

If a worker chose to ride to Illinois with a crew leader, Stokely would advance the travel allowance to the crew leader who was to provide the transportation. That travel allowance was later deducted from the worker's wages pursuant to the provisions of the clearance order, Form 560–C, and the Employment, Housing and Transportation Agreement.

*Carriage by Transportes Hispanos* Some of the commercial transportation which Stokely arranged for workers was through a common carrier, Transportes Hispanos, Inc. Stokely paid the carrier directly for the transportation. The payments were later deducted from a worker's wages pursuant to the terms of the clearance order, Form 560–C and the Employment, Housing and Transportation Agreement.

The witnesses, Roel Castillano, Miguel Castaneda and Mario Soto described their experiences and observations during a trip from Texas to Illinois on Transportes His-

panos. Castillano's description of Transportes Hispanos is strong indication of the inadequacy of that company's equipment and personnel and the failure by the company to comply with federal regulations dealing with transportation of migrant workers. However, the record is also clear that Transportes Hispanos was a company that migrant workers elected to use because of its low rates and the absence of language barriers. Whatever Transportes Hispanos' inadequacies may be, no facts appear which indicate responsibility on the part of Stokely or Solis. Moreover, whether Transportes Hispanos will continue to be used by the parties is a moot issue in light of the agreement the parties reached following the hearings in this matter on August 28–29, 1980.[2a]

There is evidence relating to Transportes Hispanos, Inc. which shows that a vehicle used by Transportes Hispanos, Inc. had tires blow out and other mechanical breakdowns between Texas and Illinois. I cannot find from evidence of that one incident, however, and I do not find as a general proposition that Transportes Hispanos, Inc. was an unsafe carrier. No actual injuries to plaintiffs or members of the class occurred or have been reported. In addition to the foregoing, an incident was reported in which a driver for Transportes Hispanos tried to extort money from two passengers in return for not informing the immigration authorities about the passengers' alien status. Again, this is a vaguely described and isolated incident.

### TRANSPORT TO INDIANA ASPARAGUS FIELDS

Stokely has asparagus fields near DeMotte in Indiana which it harvests using the services of the migrant workers at the Hoopeston, Illinois facility. In 1977 Stokely informed the workers at recruitment time that it "would try to provide transportation by bus" for workers transported daily from Hoopeston and Stockland, Illinois to the Indiana asparagus fields. Stokely was pre-vented from providing bus transportation by labor strikes in the bus company with which Stokely had contracted and Stokely was unable to secure bus transportation until the end of spring, 1977. Alternative bus charter arrangements were economically not feasible.

Between April 24 and May 28, 1977, over 100 workers of the plaintiffs' class were transported between Stokely's Illinois camps near Hoopeston and Stockton to Stokely's asparagus fields near DeMotte, Indiana. The transportation was carried out in trucks owned by crew leaders Vasquez, Salinas and Polomo. The round trip exceeded 75 miles. There is conflict in the testimony as to whether the trucks were adequately equipped with seats, fire extinguishers, and first aid kits, and provided adequate protection against the elements.

Pedro De La Fuente, Emilio De Leon and Oscar De La Fuente testified about inadequate seating, lack of protection from the elements, and the absence of safety equipment such as a fire extinguisher and first aid kits. On the other hand, Maria Mirales, Jose Espinoza, Apolinar Lopez-Garcia, Jose Ruiz, and the defendant Vasquez all testified about the adequacy of seating and protection from the elements and the presence of fire extinguishers and first aid kits. I cannot find a preponderance of the evidence exists in support of the plaintiffs' contention that the seating was inadequate or that the migrants were exposed to the elements or that there were no fire extinguishers or first aid kits in the trucks. Communication with the driver by means specified in 49 CFR § 398.5(f)(11) was not provided.

There was one incident in 1977 in which the plaintiff Oscar De La Fuente received bruises and strained muscles when the bed of one of the trucks owned and operated by the defendant Vasquez rose up because the bed was improperly fastened. Aside from that isolated incident there is nothing to support a claim for injuries to other plain-

---

**2a.** The parties agreed that the migrant workers could use transportation of their choice in returning to Texas.

tiffs or members of the class resulting from the maintenance and operation of Vasquez' trucks.

In the incident in which one of Vasquez' trucks lost a front wheel, in May, 1977, at the asparagus fields near DeMotte, the witness Jose Espinoza was a passenger in the truck and described the occurrence. The front wheel came loose while the truck was on the shoulder, and the truck came to a stop immediately. No one was injured, and the truck was repaired.

During 1977, the defendant Vasquez also transported workers from the Hoopeston facilities to the Indiana asparagus fields in a 1969 Ford truck which was not registered with the United States Department of Labor and which was not authorized to transport migrant workers. The truck did have liability insurance coverage and had been inspected under Illinois truck inspection laws but had not satisfied federal registration requirements.

Jaime Garcia, a member of defendant Vasquez' crew, who was employed by Stokely in 1977 and who was not authorized to drive by the United States Department of Labor, drove a truck transporting migrant workers for a period of about two weeks while his father, who was authorized to drive, recuperated from a hand operation.

## DEFENDANTS STATUS AS FARM LABOR CONTRACTORS

In 1977 Stokely recruited, transported, employed and housed the plaintiffs and members of their class and sought and obtained other employment for them without registering as a farm labor contractor. In 1977 Solis conducted the recruitment of plaintiffs and members of their class without registering as a farm labor contractor. In 1978 and in subsequent years, the defendants, Stokely, Solis, and Vasquez, registered with the United States Department of Labor as farm labor contractors. Stokely's plant and personnel managers also registered as farm labor contractors. Additional employees of Stokely registered as farm labor contractor employees.

The defendant Solis insists that he was informed by a state or federal agency prior to 1977 that he was not required to register as a labor contractor. I cannot find that the evidence supports his contention. Moreover, I do not see that whether he was informed or ignorant is a material matter. The point is that Solis acted deliberately and consciously, and whether he was ignorant of the law's requirements or not would have no effect on his necessity to register as a farm labor contractor. Significantly, Solis recognized the necessity of registering and did register as a farm labor contractor in 1978.

## COMPENSATION FOR TRAVEL FROM ILLINOIS TO INDIANA

The plaintiffs claim that the defendants represented to them in 1977 that the plaintiffs would be compensated for travel time from Hoopeston, Illinois to the Indiana asparagus fields. There seems to be no dispute about that fact. Maurice Schellhardt, Stokely's district manager, corroborates that claim in his testimony. What Schellhardt says, however, is that the workers were to receive one hour's pay and that in fact they were given one hour's pay. Nothing in the evidence tends to contradict Schellhardt's testimony and I find that the workers were to receive one hour's pay for travel time and that they were paid that amount.

## ASPARAGUS PICKERS' PAID LUNCH HOUR

It is impossible to determine from the evidence whether in 1977 plaintiffs and members of their class who were transported from Illinois to the Indiana asparagus fields were promised and received a paid lunch hour which was not received by the other workers. Asparagus workers were all paid on a piece work rate, and it is impossible to decipher from their pay records whether they received a paid lunch hour or not. A Stokely memorandum memorializing the 1977 crew leader briefings prior to recruitment [Plaintiffs' Exhibit 81] states that transported asparagus pickers were to be paid a minimum hourly wage including an hour lunch break. In practice the piece

rate exceeded the minimum rate and, according to some testimony, the workers either did not stop for lunch or took only a one-half hour break. That same memorandum [Plaintiffs' Exhibit 81] says that the transported asparagus pickers were not to be paid travel time.

*EMPLOYER RETALIATION*

Did Stokely and Albert Solis retaliate against Anselmo Solis in 1978? Anselmo Solis did not testify, and there is no credible evidence in the record upon which to base a finding of retaliation.

There is insufficient evidence in the record to support plaintiffs' contention that in 1977 defendant Vasquez, on one occasion, engaged in a retaliatory practice against members of his crew by telling them that he would not bring them back the following year if they complained about working conditions.

## CONCLUSIONS OF LAW

The plaintiffs assert three causes of action against the private defendants. Each cause of action is predicated on violations of the provisions of a federal statute and seeks monetary, declarative and equitable relief. Count I claims violations of the Farm Labor Contractor Registration Act (FLCRA), 7 U.S.C. § 2041 *et seq.* Count II is based upon claimed violations of the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.*, and related regulations, 20 CFR §§ 602.8, 651.-3(b)(6)(19). Count III asserts a cause of action based upon violations of the Department of Transportation Act (DOTA), 49 U.S.C. § 1651 *et seq.*, and related regulations, 49 CFR part 398 (1979). At the outset the court must decide whether the plaintiffs have a private remedy for violations of the provisions of the three statutes.

■ It is clear that a private cause of action exists for violations of FLCRA. In 7 U.S.C. § 2050(a) the Congress specifically provided that a person claiming to be aggrieved by the violation of any provision of the statute, or regulations prescribed under it, might bring suit in a district court without respect to the amount in controversy or

without regard to the citizenship of the parties and without exhausting alternative administrative remedies. The statute further provides for damages and for appeal from decisions of the district court.

■ The Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.*, provides for the establishment of the United States Employment Service to promote the establishment and maintenance of a national system of public employment offices throughout the United States. The Wagner-Peyser Act nowhere expressly provides for a private cause of action for damages. It is a statute providing a means for exchange of information on employment opportunities and conditions. The terms of the Act and its regulations do not proscribe conduct on the part of participants in the programs of the United States Employment Service. The Act assesses no penalties and affords no private remedies. The regulations deal with placement services to be provided by state agencies and specifically, in CFR § 602.8, provides for agricultural and related industry placement services. 20 CFR part 651 sets forth general provisions governing the federal-state employment service system. 20 CFR § 651.3(d)(6) provides that in addition to Wagner-Peyser Act responsibilities, the employment service system is governed or affected by the Farm Labor Contractor Registration Act of 1963, as amended. That regulation, however, cannot engraft the provisions of the FLCRA onto the Wagner-Peyser Act.

The legislative history as found in the Congressional Record, 77 Cong.Rec. 4467, 4767–4783 (1933), reveals only what the statute shows on its face. Senator Wagner in speaking in support of the bill observed:

"The bill simply provides for a coordinated system of employment exchanges between the states and the federal government."

In the House, the debate centered on the need for coordinated employment service information and the conditions of the unemployed. 77 Cong.Rec. 4767–4783 (1933). Nowhere in any of the proceedings before either house is there a mention of a private remedy.

Given the absence of a specific provision creating a private remedy and the absence of legislative history tending to support an intention to create such a remedy, a private remedy for money damages may not be implied.[3] *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2749, 61 L.Ed.2d 82 (1978).

*Espinoza, et al v. Stokely-Van Camp, Inc.*, 641 F.2d 535 (7th Cir. 1981) treats the existence of a private remedy under the Wagner-Peyser Act as "well settled" and relies upon *Gomez v. Florida State Employment Service*, 417 F.2d 569 (5th Cir. 1969). The question of whether a private remedy existed under the Wagner-Peyser Act was not raised or argued in *Espinoza* and the existence of a private remedy was taken for granted. *Gomez v. Florida State Employment Service, supra*, antedates *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) and *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2749, 61 L.Ed.2d 82 (1968), and in light of the principles announced in those two Supreme Court decisions the reasoning in *Gomez* should not be followed. Cf. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2749, 61 L.Ed.2d 82 ("to the extent our analysis in today's decision differs from that of the court in *Borak*, [*J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)] we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The ultimate question is one of congressional intent, not one whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law.")

3. Stokely-Van Camp argues that no cause of action for personal injuries exists under the Wagner-Peyser Act because state law has provided a remedy through workmen's compensation. Stokely relies upon the fourth part of the test for existence of a private remedy outlined in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080,

■ The plaintiffs, in Count III, assert a private remedy under DOTA. Section 1651 of that statute, 49 U.S.C. § 1651, declares the congressional purpose for its enactment. The statute declares that it is the purpose of the Congress to develop national transportation policies for fast, safe, efficient, and convenient transportation at the lowest cost. In pursuance of that objective, Congress established the Department of Transportation. 49 U.S.C. § 1655 provides in part:

(a) There are hereby transferred to and vested in the Secretary all functions, powers, and duties of the Secretary of Commerce and any other offices and officers of the Department of Commerce under—

(6) the following provisions of the Interstate Commerce Act as amended— .

(d) to the extent they relate to private carriers of property by motor vehicle and carriers of migrant workers by motor vehicle other than contract carriers: Sections 221(a), 221(c), and 224 (49 U.S.C. § 321 *et seq*).

49 C.F.R. part 398, promulgated pursuant to 49 U.S.C. § 304, provides regulations for the transportation of migrant workers. In summary, the regulations prescribe driver qualifications, methods and times of operation of motor vehicles, necessary parts for safe operation, hours of service of drivers, maximum driving time, and maintenance and inspection of motor vehicles while they are in operation.

The legislative history of the Act is silent as to the creation of any private remedy. H.R.Rep.No. 139J, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad. News 3009. No Senate Report was submitted with the legislation.

49 U.S.C. §§ 11704, 11705, and 11708 outline the instances when a private individual injured by the actions of a carrier subject to

2087, 45 L.Ed.2d 26 (1974). That state law has traditionally supplied a remedy is but one element to be considered in determining the ultimate issue which is, did Congress intend to create a private remedy. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1978).

the provisions of the Interstate Commerce Act[4] is entitled to bring a private action for damages or injunctive relief. Under the Act, a private damage remedy against a motor carrier is only available when the lawsuit concerns rate violations and then only when the Interstate Commerce Commission has ordered the payment of damages and the order has not been complied with by the carrier. 49 U.S.C. §§ 11705(b)(3) and (c)(2). A private action for injunctive relief is available under § 11704 to enjoin the abandonment of service and under § 11708 to secure compliance with the licensing provisions of the Act.

Since a private damage remedy is contingent upon a prior review by the Interstate Commerce Commission of the actions of the motor carrier and since the instances in which a private right of action are available are outlined with great specificity in the statute, it seems "highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1980), *quoting Cannon v. University of Chicago*, 441 U.S. at 742 (Powell, J. dissenting). This conclusion is supported by the fact that other provisions of the Act provide remedies for the statutory violations of which the plaintiffs complain through civil and criminal proceedings instigated by the Interstate Commerce Commission and the United States Attorney General. *See* 49 U.S.C. §§ 11702(a)(3), 11703, and 11914(b).

In *Transamerica, supra*, the Supreme Court held that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." 444 U.S. at 19, 100 S.Ct. at 247. In light of this admonition and the other rules enunciated by the Supreme Court for determining whether a statute provides a private cause of action, the plaintiffs have no cause of action for damages under DOTA.

While the plaintiffs may not maintain their claims for damages under the Wagner-Peyser Act and DOTA for the reasons we have advanced above, it does not follow that the plaintiffs are barred from declarative or injunctive relief under the provisions of those two statutes. *See* the discussion in *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 18–19, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979). In this case, whether private remedies exist for violations of the Wagner-Peyser Act and DOTA seems a highly academic matter in light of the specific remedies available to the plaintiffs under the provisions of FLCRA. Any of the violations of the Wagner-Peyser Act and DOTA which the plaintiffs assert can also be raised under the provisions of FLCRA and have, in fact, been raised under Count I.

### *Stokely-Van Camp as a Farm Labor Contractor and its liability for its crew leaders*

■ The defendant Stokely-Van Camp is a farm labor contractor within the meaning of Section 2042 of FLCRA, 7 U.S.C. § 2042. Stokely is a corporation who, for a fee, recruits or furnishes migrant workers for agricultural employment by Illinois seed companies in the interim periods between Stokely's harvesting and canning periods. Stokely does not meet the requirements of the exclusion for a processor or a canner because Stokely does not engage in the activities of recruiting and furnishing of migrant workers "solely" for its own operations. Were it not for Stokely's activities in securing interim employment for the migrant farm workers and recovering a fee from Illinois seed growers who employ the migrant workers in interim periods, it is conceivable that Stokely would not be a farm labor contractor within the meaning of the statute.

Stokely's crewleaders, of whom Vasquez is a model, are Stokely's agents subject to

---

4. The provisions concerning regulation of transportation of migrant workers which came under the authority of the Interstate Commerce Commission were transferred to the Department of Transportation by 49 U.S.C. § 1655(e)(6)(D).

Stokely control and direction in the discharge of their crew leader responsibilities and operations. Stokely is vicariously responsible for violations of FLCRA by the crew leaders during the period of the agency which extends from recruitment in Texas until the return of the workers to Texas at the close of a season. Restatement (Second) of Agency §§ 1–2 (1957).

### Statutory Violations by the Private Defendants

Section 2045 of FLCRA, 7 U.S.C. § 2045, provides in pertinent part that:

Every farm labor contractor shall—

(b) ascertain and disclose to each worker at the time the worker is recruited the following information [in written Spanish]

(4) the wage rates to be paid him,

(5) the charges to be made by the contractor for his services,·

(c) Upon arrival at a given place of employment, post in a conspicuous place a written statement of the terms and conditions of that employment.

Each of the private defendants has violated the foregoing provisions of FLCRA during the years in question. Clearance orders that were given to the migrant workers at the time of recruitment were not in written Spanish as required by the statute. By failing to inform the workers of the Stokely-Van Camp asparagus dockage policy the defendants in effect failed to disclose to the workers the wage rates to be paid to them. The defendant, Vasquez, by failing to tell the migrant workers of the commissions he received from Stokely and the interim employers and by failing to disclose how much Vasquez was paid during in-plant operations in canning season violated the requirement that he tell the migrant workers of the charges to be made by him for his services. Stokely in failing to inform the workers of the payments received by Stokely from interim employers to defray Stokely's housing costs failed to carry out the statutory mandate to tell the migrants the charges made by Stokely for its services. Stokely and Vasquez in further violation of the statute failed to post a written statement of the terms and conditions of employment in a conspicuous place when the workers arrived at the place of their employment and thereby failed to give effective notice to the workers of the terms and conditions of their employment. Stokely and Solis failed to register in 1977.

### CIVIL RELIEF

If the court finds an intentional violation, "it may award damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief." 7 U.S.C. § 2050a(b).

The term intentional in the statute has been construed to mean conscious or deliberate and not to require a showing of a specific intent to violate the law. *DeLeon v. Ramirez*, 465 F.Supp. 698, 705 (S.D.N.Y. 1979); *Guerrero v. Garza*, 464 F.Supp. 509 (W.D.Wis.1978); *Aranda v. Pena*, 413 F.Supp. 849, 850 (S.D.Fla.1976); *Hutchison v. Lake Oswego School District*, 374 F.Supp. 1056, 1064 (D.Ore.1974).

It is clear that the private defendants acted intentionally within the meaning of the statute. Their activities were conscious and deliberate although they may have had no specific intention to violate the law and avoid its provisions.

The plaintiffs concede that they have not proved actual damages or out of pocket losses. Out of pocket losses could have been proved with respect to the Stokely asparagus dockage policy for grade and foreign material but the plaintiffs elected not to make that proof. Instead the plaintiffs rely upon the statutory provision for $500 for each violation and argue that each member of the class should recover that amount for each violation shown by the evidence.

*Espinoza v. Stokely-Van Camp, Inc.*, 641 F.2d 535 (7th Cir. 1981) discusses the legislative history of the Act and the congressional intent in the damage provision of the statute. "[C]onstruing section 2050a(b) to permit liquidated damages of $500 for each violation of the act furthers the Congres-

sional intent of strengthening its enforcement." *Id.* at 539. *Espinoza* concludes that liquidated damages may be awarded in the absence of proof of actual damages. *Espinoza* does not require an award of $500 per violation per claimant.

Application of the plaintiffs' construction of the civil damage provisions of FLCRA would dictate an award of damages of $12,160,000.[5] That approach is inconsistent with the evils Congress sought to overcome in enacting FLCRA. FLCRA was intended to overcome the exploitation by farm labor contractors of both farmers and migrant workers by requiring disclosure of terms and conditions of employment and through registration of contractors and regulation of their activities. 7 U.S.C. § 2041; 1974 U.S.Code Cong. & Adm.News 6441–6443. It was not the intention of Congress to create a means for awarding punitive damages[6] that would in effect destroy contractors economically for violations which, while they were intentional, were not committed maliciously or with intent to defraud. The literal application of a $500 per violation per claimant liquidated damage rule in this class action with approximately 1500 members in the class would produce such an unintended result.

Turning to the language of the statute to ascertain the intent of the Congress, *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *Busse v. C.I.R.*, 479 F.2d 1147, 1151 (7th Cir. 1973), it is plain that the section on civil relief must be construed by viewing the act in its entirety. The obvious thrust of 7 U.S.C. § 2050a(b) is to give the trial court broad discretion to fashion a civil remedy to effectuate the purpose of the statute. The plain meaning is that an amount *up to* the actual damages or *up to* $500 for each violation may be awarded or equitable relief may be given when it is appropriate. In this case a sufficient amount of liquidated damages should be awarded to compensate fairly the migrant

workers for the effects of the violations. Suitable equitable relief should also be given to insure future compliance by the defendants. The damage award should not be punitive.

*Money Damages*

The asparagus dockage policy affords the best opportunity at quantifying the workers' damages. The variation in dockage spanned 0% to 25% of a worker's pickings. Taking the evidence in the light most favorable to the plaintiffs and assuming a 75¢ per hour loss in earnings, each worker during an asparagus picking season earned approximately $90.00 less than he would have earned without the dockage policy.

Assessing damages for the remaining violations of the statute is a more difficult task. Failing to disclose working terms and conditions by providing the workers with an understandable, written, Spanish statement is mitigated to some extent by the distribution of the 560–C ISES form which was in Spanish. Stokely and Vasquez didn't tell the workers about the commissions they received from the workers' employers during the interim periods when the workers were not engaged in Stokely operations. Vasquez didn't reveal the commission of 10¢ per hour per worker which Stokely paid him during in-plant canning operations. Could the workers have negotiated for themselves if they had been aware of the commissions and recovered some of the commissions for themselves? It seems very doubtful that they could. Moreover the commissions were not intended as part of the compensation for the migrant labor but were paid to the contractors for services rendered by the contractors. One hundred dollars ($100.00) per worker per season is a sum which would fairly and equitably compensate the workers for the defendants' remaining statutory infractions.

## EQUITABLE RELIEF

The plaintiffs are also entitled to equitable relief to prevent future FLCRA viola-

---

5. 16 separate statutory violations × $500 × 380 (average no. of workers per year) × 3 years.

6. The statute contains civil and criminal penalties for noncompliance. 7 U.S.C. §§ 2043, 2048.

tions by the defendants. The defendants, and each of them, shall be required in the future to provide all workers with a clearance order in Spanish. The order in addition to other statutory requirements shall describe the asparagus dockage policy and the commissions earned by crewleaders and by Stokely.

Stokely and crewleaders shall post a complete statement of all the terms and conditions of employment including commissions to be earned by contractors on all employee bulletin boards and housing bulletin boards in Stokely's offices, plants, and camps in Illinois. The statement shall be written in understandable Spanish.

The evidence of Vasquez' operation of motor vehicles in transporting migrants from Texas to Illinois and from camp to field show violations of certain provisions of 49 C.F.R. part 398. The violations of the regulations dealing with the registration of vehicles and drivers have been adjudicated and punished through administrative proceedings. Equitable relief to avoid future violations is merited.

Vasquez shall, in the future, comply with the requirements of 49 C.F.R. part 398 and specifically with the requirements of §§ 398.4(5)(h)(i)(j), 398.5(4)(11).

## CLAIMS AGAINST THE SECRETARY OF TRANSPORTATION

■ In Count IV the plaintiffs seek declarative and equitable relief against the Secretary of Transportation and the Director of Region V of the Department of Transportation. Plaintiffs seek a declaration that the provisions of 49 C.F.R. part 398 adopted in 1957 are not reasonable requirements with respect to the comfort of passengers, qualifications and maximum hours of service of operators, the safety of operations and equipment for the interstate transportation of migrant farmworkers. The plaintiffs further seek an injunction directing the Department of Transportation, the Secretary, and the Region V Director to promulgate amendments to 49 C.F.R. part 398 which incorporate, or modify as appropriate, the provisions of 49 C.F.R. parts 391, 392, 393 and 396.[7] The plaintiffs and the defendants have filed cross motions for summary judgment. The remaining issue in Count IV is the proper subject of disposition by summary judgment, and summary judgment should be granted in favor of the defendants and against the plaintiffs.

49 C.F.R. provides rule making procedures for Federal Motor Carrier Safety Regulations. 49 C.F.R. § 389.31 *et seq.* establish procedures through which interested persons may petition the Department for the initiation of rule making proceedings. It is undisputed that the plaintiffs have not followed those procedures. The plaintiffs assert that it would be a useless and empty exercise on their part to petition the Secretary to undertake a reconsideration of the regulations for transportation of migrant farmworkers which are contained in 49 C.F.R. part 398. The plaintiffs argue that there is no requirement for exhaustion of administrative remedies when it is apparent that the exhaustion of those remedies would be a fruitless effort. I recognize and follow the precedents which hold that exhaustion is unnecessary where it is apparent that the administrative remedy would afford no relief. I cannot conclude in this case that exhaustion would be fruitless

7. Originally the plaintiffs sought injunctive and declarative relief against the Department of Transportation, the Department of Labor, and the Interstate Commerce Commission, claiming a failure on the part of those agencies to enforce laws and regulations governing the transportation of migrant farmworkers. Judgment on the pleadings in favor of the Interstate Commerce Commission against the plaintiffs was granted in November 1979. The plaintiffs then amended their complaint and claimed that the Department of Transportation had unlawfully failed to amend the 1957 regulations governing the transportation of migrant farmworkers to reflect current standards of safety and comfort. On October 14, 1980, pursuant to a settlement agreement the Court dismissed the plaintiffs' claims against Transportation and Labor regarding the inadequate enforcement of existing statutes and regulations. The remaining issue in Count IV is the failure of Transportation to adopt new regulations which reflect the Secretary's knowledge concerning current standards of safety and comfort.

where the plaintiffs have failed even to initiate the established administrative proceedings that conceivably could lead to the relief the plaintiffs seek. Moreover, and perhaps most importantly, the Secretary, on his own initiative, has undertaken the first phase of the rule making procedure to consider changes in 49 C.F.R. part 398. I cannot blithely accept the plaintiffs' contention that the rule making procedure initiated by the Secretary will not come to fruition, especially since the plaintiffs, by their own admission, have not deemed it worthwhile to participate in the public aspects of the rule making procedure. The exhaustion of administrative remedies doctrine should not be abandoned lightly.

It provides an agency with an opportunity to correct its own errors, to afford the parties and the courts the benefit of [the agency's] experience and expertise, and to compile a [factual] record which is adequate for judicial review.

*Uniroyal, Inc. v. Marshall*, 579 F.2d 1060, 1064 (7th Cir. 1978) *quoting Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975). *See also* the discussion in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543–549, 98 S.Ct. 1197, 1211–1214, 55 L.Ed.2d 460 (1978).

The plaintiffs seek extraordinary relief in the form of a mandatory injunction, which partakes of the nature of a writ of mandamus.[8] *Save the Dunes Council v. Alexander*, 584 F.2d 158, 162 (7th Cir. 1978) sets forth the elements which must be considered before a court will interfere by injunction in the exercise of administrative functions.

It is manifest that the judiciary cannot compel through a writ of mandamus a federal official to perform any function unless the official is clearly directed by law to perform such a duty. This Court has held that mandamus jurisdiction is present only when a clear, plainly defined, and peremptory duty on the federal defendant is shown and there is a lack of an adequate remedy other than

mandamus. *Vishnevsky v. United States*, 581 F.2d 1249 (7th Cir. 1978), citing *City of Highland Park v. Train*, 519 F.2d 681, 691 (7th Cir. 1975), *cert. denied*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976), and *City of Milwaukee v. Saxbe*, 546 F.2d 693, 700 (7th Cir. 1976). The peremptory duty must be either a ministerial one or an obligation to act within a specified range of discretion. *Davis Associates, Inc. v. Secretary, HUD*, 498 F.2d 385, 389 (1st Cir. 1974); *Miller v. Ackerman*, 488 F.2d 920, 921–22 (8th Cir. 1973). Finally, mandamus jurisdiction does not lie to direct the exercise of administrative discretion within its lawful boundaries. *Wilbur v. United States, ex rel. Kadrie*, 281 U.S. 206, 218–19, 50 S.Ct. 320 [324], 74 L.Ed. 809 (1930).

I cannot find from the materials that are adduced in support of the motions for summary judgment that there is a clear, plainly defined, and peremptory duty on the federal defendants and the lack of an adequate remedy for the plaintiffs other than mandamus. To the contrary, the plaintiffs should at least participate in the initial stages of rule making before they complain about absence of a remedy. Rule making is a discretionary matter in large part, and in light of the materials in support of the motions for summary judgment, I do not conclude that there is a peremptory duty on the defendants to undertake revision of the existing regulations. Under the circumstances, no material issue of fact exists under Count IV and summary judgment in favor of the defendants and against the plaintiff should be entered on Count IV.

JUDGMENT ACCORDINGLY.

---

8. Fed.R.Civ.P. 81(b) abolishes the writ of mandamus and provides that relief available by that writ is to be obtained through practices prescribed in the Rules.