**Guadalupe F. ALVAREZ, et al., Plaintiffs-Appellants, Cross-Appellees,**

v.

**JOAN OF ARC, INC., Defendant-Appellee, Cross-Appellant.**

**Nos. 80–2041 and 80–2106.**

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1981.

Decided Sept. 8, 1981.

---

F. Thomas Hecht, Ill. Migrant Legal Asst., Proj. Leg. .Asst. Found. of Chgo., Chicago, Ill., for plaintiffs-appellants-cross-appellees.

Richard C. Kavanagh, Julian E. Cannell, Peoria, Ill., for defendant-appellee-cross-appellant.

Before CUMMINGS, Chief Judge, GIBSON, Senior Circuit Judge,[*] and BAUER, Circuit Judge.

CUMMINGS, Chief Judge.

Plaintiff-appellant Guadalupe Alvarez and all other members of the plaintiff class[1] are Spanish-speaking migrant farmworkers. In April 1978 they traveled from Texas to Illinois to work for defendant Joan of Arc, Inc. (sometimes "Company") harvesting asparagus. Plaintiffs claim that Joan of Arc violated the Farm Labor Contractor Registration Act ("FLCRA"), 7 U.S.C. §§ 2041 et seq., the Wagner-Peyser Act, 29 U.S.C. §§ 49 et seq., and Illinois contract law. After a bench trial, the district court entered judgment in favor of plaintiffs on only one of plaintiffs' three counts. It is from this judgment which plaintiffs appeal and Joan of Arc cross-appeals. For the reasons discussed in this opinion, we affirm.[2]

I

Joan of Arc is a corporation doing business in Princeville, Illinois, growing, harvesting, and canning vegetables. The Company employs migrant seasonal workers as needed. Joan of Arc obtains some of its workers through participation in the Interstate Recruitment System established by the Wagner-Peyser Act. Pursuant to the requirements of that Act, defendant filed a clearance order with the Illinois State Employment Service in February 1978 specifying, inter alia, the number of workers needed, the period of employment, and the type of work to be done. See 20 C.F.R. § 653.-108(c)(2) & (d).

During January and February 1978, Sidney Stahl and David Stoner, employees of Joan of Arc, traveled to Texas to meet with labor recruiters Audaz Garza, Raul Lopez, and Benito Sanchez. Stahl and Stoner provided Garza, Lopez, and Sanchez with work agreements and copies of the clearance order to be given to recruited laborers. In addition, Garza, Lopez, and Sanchez were authorized to enter into contracts on behalf of Joan of Arc and advance each hired migrant worker $30 for travel expenses. The recruiters were told not to send any laborers to Illinois until they received notice from the Company that the asparagus was ready to harvest.

---

[*] The Honorable Floyd R. Gibson, Senior Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

[1.] The class consists of all migrant farmworkers who on or after January 1, 1978, had been or would in the future be recruited by the defendant Joan of Arc company. A rule 23(b)(3), Fed.R.Civ.Proc., subclass for damages, consisting of migrant farmworkers recruited for the 1978 season, was also certified. All subclass members were notified of the pendency of this action. Fed.R.Civ.Pro. 23(c)(2). Over 100 members withdrew from the class, leaving approximately 300 farmworkers in the damages subclass.

[2.] In a prior opinion released on May 18, 1981, 649 F.2d 499, we reversed and remanded that part of the judgment below awarding each class member $100 liquidated damages instead of $500 apiece. On August 10 we granted the petition for rehearing and withdrew the prior opinion because we have concluded that the district judge could properly award $100 to each class member for defendant's violation of the Act.

During April 1978, Stahl notified Garza, Lopez, and Sanchez that work was ready for the migrants. The laborers were advanced the $30 and left Texas for Illinois. By April 27, 1978, approximately one-half of the migrants had arrived in Princeville. Harvesting began on May 1, 1978.

While the migrants were in Princeville, they were housed in four camps owned by Joan of Arc: Main Camp, Laura Camp, Wyoming Camp, and Monica Camp. Prior to the arrival of the migrants, the camps were inspected by representatives of the Illinois Department of Public Health. On May 3, 1978, the Department issued a license for the camps approving the housing for occupancy.

Plaintiff Guadalupe F. Alvarez brought this class action on behalf of all the migrant workers hired by Joan of Arc and housed in the four camps during the 1978 asparagus harvest. The complaint set forth three separate claims: (1) that the Company violated the FLCRA by failing to register with the United States Secretary of Labor as a farm labor contractor, (2) that the Company violated the FLCRA, the Wagner-Peyser Act, and Illinois contract law by failing to inform plaintiffs that the announced harvest starting date depended upon crop and weather conditions, and (3) that Joan of Arc violated the FLCRA and the Wagner-Peyser Act by providing housing that failed to comply with state and federal sanitation and safety regulations. The district court found for plaintiffs on the first claim and for defendant on the latter two. The court awarded each class member $100 liquidated damages.

## II

The FLCRA requires every farm labor contractor to register with the Secretary of Labor. 7 U.S.C. § 2043(a). A farm labor contractor is any person or corporation that, for a fee, either on its own behalf or the behalf of another, "recruits, solicits, hires, furnishes, or transports migrant workers . . . for agricultural employment." 7 U.S.C. § 2042(a), (b). Joan of Arc did not register as a farm labor contractor until

June 1978, after the plaintiff migrant workers were hired. The district court found that defendant was a farm labor contractor in April and May 1978 when plaintiffs were hired and that Joan of Arc's failure to register before then violated the FLCRA.

Joan of Arc claims that the district court erred, as a matter of law, in concluding that it was a farm labor contractor. Defendant argues that it did not recruit, solicit, hire, furnish, or transport migrant workers. Defendant argues alternatively that if it did any of the acts set forth in the statute, it did not do them "for a fee" as required by § 2043(b). Finally, the Company asserts that even if it was a farm labor contractor, it was exempted from the registration requirement by 7 U.S.C. § 2042(b)(2).

The record more than sufficiently supports the district court conclusion that Joan of Arc engaged in the conduct of a farm labor contractor as set forth in 7 U.S.C. § 2042(b). Defendant argues that it was not a farm labor contractor because it did not solicit workers; rather Garza, Lopez, and Sanchez, as independent contractors, did. Garza, Lopez, and Sanchez were authorized to distribute Joan of Arc's clearance order and work agreements to recruited workers and to contract with the migrants on Joan of Arc's behalf. They acted as Joan of Arc's agents in recruiting migrant workers for the Company. Hence Joan of Arc was a farm labor contractor soliciting migrant workers on its own behalf.

The clearance order also stated that Joan of Arc would assist the migrants in finding employment with local farmers, producers, and nurseries during the interim period between the end of the asparagus harvest and the beginning of the canning season. The district court did not err in concluding that this language signified that Joan of Arc was soliciting laborers on behalf of others.

Joan of Arc argues that even if it did engage in the conduct of a farm labor contractor, it did not do it "for a fee" as required by § 2042(b). The Act defines a

"fee" as any money or other valuable consideration paid to the farm labor contractor by another for the contractor's services. 7 U.S.C. § 2042(c). Defendant stipulated that the growers for whom the migrants worked during the interim paid Joan of Arc an amount equal to the cost of housing the workers. This payment of money falls within the statutory definition of a "fee."

Finally, the Company argues that even if we find that it falls within the § 2042(b) definition of a farm labor contractor, it is exempted from the registration requirement by 7 U.S.C. § 2042(b)(2). Section 2042(b)(2) exempts only those farm labor contractors who solicit workers *solely* for their own operations. As discussed above, Joan of Arc solicited migrant workers on behalf of other growers. Thus its conduct does not fall within the statutory exemption.

### III

The FLCRA provides that the district court may award damages to migrant workers solicited or recruited by farm labor contractors who have failed to register with the Secretary of Labor. The Act provides in pertinent part:

> "If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation prescribed hereunder, it may award damages up to and including an amount equal to the amount of actual damages, *or* $500 for each violation, or other equitable relief."

7 U.S.C. § 2050a(b) (emphasis added). The district court found that plaintiff suffered no actual damages as a result of Joan of Arc's failure to register and awarded each plaintiff $100 in liquidated damages.

The district court entered judgment in this case on June 17, 1980. On February 26, 1981, while this appeal was pending, we held in *Espinoza v. Stokely-Van Camp, Inc.,* 641 F.2d 535, 538–539 (7th Cir. 1981), that § 2050a(b) permits a district court to award either actual damages or "liquidated damages of $500 for each violation of the act." Since the district court chose to award liquidated damages, under *Espinoza* it would be

required to award each plaintiff $500. We now overrule that part of *Espinoza* and therefore affirm Judge Morgan's award of $100 to each plaintiff. See Part VI *infra.*

### IV

Plaintiffs appeal the district court's finding that Joan of Arc did not violate the FLCRA, the Wagner-Peyser Act, or Illinois contract law by failing to inform the migrant workers that the dates of employment were contingent upon crop and weather conditions. We agree with the conclusion of the district court.

■ Section 2045(b) of the FLCRA requires farm labor contractors to disclose the terms and conditions of employment, including the period of employment, "in writing in a language in which the worker is fluent, and written in a manner understandable by such workers." Plaintiffs stipulated that each recruited migrant worker received a copy of the work agreement written in Spanish. This agreement stated that the term of employment would commence "about May 1, 1978." Section 2045(b) only requires the contractor to disclose that the starting date is tentative; it does not require the contractor to list with specificity all of the possible contingencies that may affect the starting date. Harvesting is dependent on crop maturity and weather conditions, a fact that surely must be known by migrant harvesters. This disclosure contained in the work agreement informed plaintiffs that the starting date was tentative, as required by § 2045(b).

■ The regulations promulgated pursuant to the Wagner-Peyser Act provide that the clearance order accurately state all the material terms and conditions of employment. 20 C.F.R. § 653.108(c)(2), (3) & (d). In *Espinoza, supra,* 641 F.2d at 540, we held that these regulations impose an implied duty to refrain from contradicting the terms listed on the clearance order.

The clearance order filed by Joan of Arc and disseminated to the plaintiffs indicated that "DATES ARE APPROXIMATE." There is no evidence in the record indicat-

ing that defendant ever contradicted that warning. We find that the defendant's disclosures about the tentative nature of the starting date satisfied the requirements of the Wagner-Peyser Act.

■ Finally, we do not find that defendant violated Illinois contract law. Both the work agreement and the clearance order stated that starting dates were approximate. That is the term of employment to which the migrants agreed. The harvest did, in fact, begin on May 1, 1978. Within a few days after that date, all of the migrant workers were put to work harvesting. Defendant's conduct in no way breached its agreement with the plaintiffs.

## V

■ Plaintiffs claim that Joan of Arc violated the FLCRA, 7 U.S.C. § 2044(a)(4), and the Wagner-Peyser Act and its regulations, 20 C.F.R. §§ 620 et seq., because the housing it provided did not comply with state and federal regulations. Specifically, plaintiffs allege inadequacy in the hot water supply, roof leakage in some units, standing water on the camp grounds, broken or inoperative plumbing fixtures and water on the floors of some of the communal bath and restroom facilities, occupancy of some housing units in excess of the maximum licensed occupancy limits, inadequate garbage removal, and insufficient recreational facilities. We agree with the district court that plaintiffs failed to prove a violation, and we adopt that portion of the district court opinion:

"Defendant's clearance order represented that its housing had been approved by that responsible agency in 1977, and that the same would be subject to inspection and approval for the 1978 harvest season. Pre-licensing inspections were conducted by the Department of Health employees on March 20, 1978. A follow-up inspection of defendant's camps was made by the same agency on April 17, at which time defendant was advised by the agency that its housing was approved for occupancy licensing for the 1978 harvest season. The requisite licenses were issued later by the agency. Further inspections by the Department of Public Health were made in June and July. In late May 1978, a housing inspection was conducted by an agent of the United States Department of Labor.

\* \* \* \* \* \*

"No evidence even suggests that the housing was not in compliance with established standards when occupancy commenced in April 1978. There is evidence that on particular dates in late May, in June and in July, housing deficiencies were observed to exist. That evidence is wholly insufficient to prove that defendant was remiss in maintaining its housing to comply with required standards during the period of occupancy.

"Defendant employed both migrant labor and a plumbing contractor to maintain its housing facilities. A company supervisor made periodic inspections to determine that the facilities were being properly maintained by defendant's employees. Also, the facilities were subject to inspection, and the same were inspected, from time to time by employees of the Illinois Department of Public Health and of the federal Department of Labor. Although inspection reports from time to time found defects which required correction, there was no action by either agency to terminate licensing of the housing or to disqualify defendant from participation in the interstate recruitment system. The evidence includes the testimony of a witness for plaintiffs that it is commonplace to find occasional deficiencies during the period of occupation of migrant housing facilities. Reports of the responsible employees of the state and federal agencies reflect that defendant did undertake remedial measures to correct deficiencies which were found to exist from time to time. The evidence here only reflects the natural wear and tear upon facilities being used by people.

"Further comment on the evidence can be limited to a few particular areas.

"An examination in late May of the facilities by Carmen Alvarez, then a staff

employee of the Illinois Migrant Assistance Project, disclosed that the hot water supply in the communal bath houses in the main camp was deficient. She reported that observation to both the State agency and to defendant's official, Sidney Stahl. She was advised by Mr. Stahl that the situation would be remedied. Within a few days thereafter, defendant installed additional water heating units. Although it might be presumed that the deficiency existed at the time of initial occupancy of the camp, there is no evidence that defendant was aware of the deficiency prior to Ms. Alvarez's complaint.

"A like response by defendant is reflected with relation to its receipt of notice that garbage was accumulating in its Laura camp. Defendant had assigned to a migrant employee the task of garbage removal and disposal at the camp. When investigation revealed that that individual had not regularly performed the task, the employee was replaced by defendant.

"The evidence related to the complaint of permitted occupancy in excess of maximum unit capacity is wholly unconvincing. The maximum occupancy limitation of each housing unit was fixed in conformity with housing standards. In certain instances in 1978, actual occupancy did exceed the fixed and posted occupancy limits. Those instances of over-occupancy were created by the volition of particular migrant families. As family size required it, additional housing units were assigned to a particular family. In the instances of which complaint is made, the adult migrants had elected to house the whole family under one roof, or to not have both male and female siblings occupying a unit without adult supervision.

\* \* \* \* \* \*

"A basic premise which must underlie any discussion as to alleged housing defi-

ciencies is the premise that defendant was justified in relying upon the approval by the Department of Health of its housing as being in compliance with occupancy standards. It is not surprising that problems did develop during the period of occupancy, and the evidence preponderates in support of a finding that defendant did take reasonable steps to alleviate those deficiencies as the same became known to it. Plaintiffs rely upon a report by Department of Public Health inspector that the design of certain plumbing in the main camp did not comply with standards fixed by the Illinois Plumbing Code. However, that report was delivered to defendant at the end of the 1978 harvest season. It has no tendency to indicate that defendant was previously aware of any such claimed deficiency, or that it was not theretofore entitled to rely upon the approval and licensing of its housing by the same agency, as indicative of the fact that its facilities did comply with all requirements.

"Defendant's clearance order accurately represented that its housing facilities had been approved in 1977 and that approval for the 1978 season would be obtained. It did not represent that no problems would arise during the period of occupancy, nor that on any particular day during the period of occupancy an investigator would find every facet of its facilities in perfect order. Its good faith effort to correct deficiencies as the same came to its attention should not be penalized." [3]

*Alvarez v. Joan of Arc Company*, No. 78–1250, slip op. at 13–16 (C.D.Ill. June 17, 1980).

## VI

Since the farm laborers in this case alleged damages for violations of various provisions of the FLCRA and the dis-

---

**3.** Plaintiffs also complain that Joan of Arc failed to provide adequate recreational space in its labor camps. Plaintiffs cite to evidence in the record indicating that the camps lacked recreational *equipment.* Defendant, however, is only required to provide recreational *space.* 20 C.F.R. § 620.4(d). There is no evidence in the record to show that the space available was inadequate.

trict judge found merit in their claim that Joan of Arc failed to register as a farm labor contractor, they were persons "claiming to be aggrieved" within § 2050a(a) and therefore had standing to sue. Since he also justifiably found that Joan of Arc's violation of the Farm Labor Contractor Registration Act was merely "a harmless technical violation" (App. 17), Judge Morgan was plainly entitled to award each class member liquidated damages below the statutory maximum $500 apiece. This would be absolutely clear if the penultimate comma were absent from § 2050a(b), *supra*, p. 1221. We should not let that solecism interfere with the Congressional intent. As shown in the pertinent Senate Report, the court is to "award [liquidated] damages up to $500 for each violation * * *." [4]

The fallacy inherent in the *Espinoza* construction of § 2050a(b) becomes patent through a simple example: if each member of the class suffered only $10 in actual damages, the district court could nevertheless award each class member $500 in liquidated damages! Moreover, even though the district judge characterized defendant's violation as "intentional" (App.17) as required by the opening clause of § 2050a(b), the record offers no support for a specific intent finding and Judge Morgan found defendant not "culpable" (*ibid.*). In fact, as noted, the district judge properly characterized the violation as a "harmless technical" one [5] and consequently in the absence of actual damages he awarded only $100 to each of the estimated 300–320 [6] in the class. On the other hand the award would have been at least $150,000 to plaintiffs under the obligatory $500 per person *Espinoza* rule, again illustrating that properly construed, the statutory language really means "up to $500 for each violation" instead of $500.

Although no specific intent of defendant to violate the FLCRA was found, the term "intentional" in Section 2050a(b) means conscious or deliberate and does not require a specific intent to violate the law. *De La Fuente v. Stokely-Van Camp, Inc.*, 514 F.Supp. 68, 79 (C.D.Ill.1981). The record supports the district court's finding of an intentional violation in that sense.

 As noted, the district court awarded liquidated damages when no actual damages were shown. As shown in *Espinoza*, this reading of the statute was justified by the wording of § 2050a(b) and its legislative history. 641 F.2d at 538–539. This interpretation furthers the Congressional intent to strengthen the enforcement of the Act and furthers its remedial purposes. The district court's award of liquidated damages of at least $30,000 here cannot be deemed an abuse of discretion nor unduly punitive for an intentional violation of the FLCRA. See *De La Fuente, supra* at 79–80 (liquidated damages of $100 per worker per asparagus picking season to be awarded some of class of 1500 for violations of §§ 2043(a) and 2045 where plaintiffs did not prove actual damages or out-of-pocket losses).

Therefore we hold that an award of liquidated damages in the present case was authorized by § 2050a(b) and that the amount thereof was within the latitude accorded to the district court by that provision.[7]

Judgment affirmed.

---

**4.** See 4 U.S.Code Cong. & Admin.News 6441, 6450 (1974).

**5.** The violation consisted of inadvertently not applying for registration with the federal Department of Labor until April 1978 although the Illinois Department of Labor and Texas Employment Commission had earlier approved defendant's recruitment of migrant workers which commenced in late 1977.

**6.** This estimate was given by defense counsel at oral argument. The precise number will be determined on the remand.

**7.** Like Judge Baker in *De La Fuente, supra*, we disagree with those district courts holding that § 2050a(b) compels an award of $500 per claimant. See decisions collected in *Espinoza, supra*, 641 F.2d at 539.