Antonia **MONTELONGO**, et al.,
**Plaintiffs-Appellees
Cross-Appellants,**

v.

Edwin **MEESE**, III, Attorney General,
**et al., Defendants,**

Glen **Martin**, et al.,
**Defendants-Appellants
Cross-Appellees.**

No. 85–2412.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1986.

Rehearing and Rehearing En Banc
Denied Dec. 17, 1986.

See also, 5th Cir., 777 F.2d 1097.

**1344**

Thomas J. Bacas, Washington, D.C., Robert L. Guerra, McAllen, Tex., for defendants-appellants, cross-appellees.

James A. Herrmann, Harlingen, Tex., for plaintiffs-appellees, cross-appellants.

Before BROWN, REAVLEY and JONES, Circuit Judges.

REAVLEY, Circuit Judge:

This case arises out of defendant Glen Martin's recruitment of the plaintiff class of migrant farm workers to harvest cantelopes in the Presidio and Redford Valleys (Presidio) in June 1977. Defendants Martin, Griffen & Brand of McAllen, Inc. (G & B), Presidio Valley Farmers Association (PVFA) and Presidio Valley Farms, Inc. (PVF) appeal the judgment holding them liable to plaintiffs for violations of the Farm Labor Contractor Registration Act (FLCRA), 7 U.S.C. §§ 2041 *et seq.* (repealed 1983).[1] Plaintiffs cross-appeal, contesting the district court's denial of certain alleged class members' claims. We affirm in part, reverse in part and remand for further proceedings.

### FACTS

Presidio is a remote agricultural enclave in Southwest Texas, along the Rio Grande

---

**1.** The FLCRA was repealed and replaced by the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §§ 1801–72 (1982). Claims arising under the FLCRA, however, survive. *See, e.g., Salazar-Calderon v. Presidio Valley Farmers Association,* 765 F.2d 1334, 1346 n. 6 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986).

River adjacent to the Mexican city of Ojinaga. Until 1977, Presidio growers regularly hired undocumented workers from Ojinaga to harvest their onion, cantelope and pepper crops from May through July or August. In the spring of 1977, however, the Immigration and Naturalization Service (INS) decided to enforce the border, cutting off the flow of Mexican workers. Thus faced with no guaranteed supply of workers for their upcoming harvests, Presidio growers joined together to form the Presidio Valley Farmers Association. PVFA's main, short-term objective was to secure enough workers, either domestically or from Mexico, to harvest its members' crops.

Billy Joe Bishop, president and co-owner with G & B of Presidio Valley Farms, was named president of PVFA. On behalf of both PVF and PVFA, he enlisted the help of G & B, a registered farm labor contractor, in finding workers for Presidio.[2] Upon learning of the labor crunch, G & B president Othal Brand in turn contacted Glen Martin, G & B's principal farm worker recruiter.[3] Brand told Martin to "do whatever was necessary" to find domestic farm workers for Presidio.

In May and early June, Martin spoke to numerous crew leaders, orally offering them work in Presidio for themselves and their crews. No housing was available, however, and the crew leaders would not go where there was no place to live.

Finally, Martin added housing to the terms of the offer. Thereafter, plaintiffs Crispin Sanchez, Juanita Martinez, Santiago Quintero and Florencio Camacho accepted and began assembling crews; Camacho also asked crew member Jose Flores to help him find additional people. As the work was to begin in mid-June, these crew leaders were told to return between June 9 and 13 for exact departure instructions.

Meanwhile, PVFA had also been negotiating with INS and the Department of Labor (DOL) throughout the spring for 809 temporary worker (H–2) visas for the Mexican workers they had previously employed. After much hesitation, INS suddenly issued the visas on June 9 or 10.

With an adequate supply of workers from across the border, Presidio growers no longer needed domestic crews. Thus, when the crew leaders appeared as agreed for departure instructions, Martin informed them that the deal was off, leaving plaintiffs without work for most of June. Martin did offer work in July in Fort Stockton/Pecos; Martinez and Camacho accepted although most of their crews drifted off to other jobs before that time.

Several crew members brought the present suit soon thereafter, seeking damages against these defendants[4] for breach of the employment agreements and FLCRA violations. Following various delays, a class of the recruited farm workers was certified in 1980, and a bench trial held in 1982.

The district court found that Martin had violated three provisions of the FLCRA, and awarded liquidated damages of $500 to each class member for each violation. Then, applying agency principles, it held G & B and PVFA jointly and severally liable with Martin for these violations. The court further found that PVF had violated another FLCRA provision, and awarded $500 per member for that violation. In addition, it awarded plaintiffs costs and attorney's

**2.** G & B is a large produce growing, packing and sales concern based in the lower Rio Grande Valley with business interests throughout Texas, including the co-ownership of PVF and packing and/or sales agreements with other Presidio growers.

**3.** A large part of Martin's duties as director of harvest consisted of the recruitment of farm workers for G & B and its associated operations, by hiring independent crew leaders who came to his office seeking work for their crews.

**4.** In addition to the defendants here, plaintiffs sued INS and several government administrators for creating the labor crisis in Presidio and bungling the visa process. The court awarded plaintiffs equitable relief and attorney's fees against the government defendants, who have not appealed. For a description of the H–2 visa process in this case, see *Salazar-Calderon*, 765 F.2d at 1338–39, 1341–43.

fees, under Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon 1971), *repealed & replaced by* Tex.Civ.Prac. & Rem.Code Ann. §§ 38.001–006 (Vernon 1986), and interest as of the date of the liability order. The court also found defendants liable to the four crew leaders on breach of contract claims, but it later determined that they had failed to prove any contract damages.

Notice was then sent to all potential class members. Two hundred and three people filed claims. Defendants challenged numerous claimants; after a hearing in 1984 at which each crew leader identified the members of his crew, 159 claims were approved. Final judgment was entered in May 1985, and this appeal followed.

## DISCUSSION

Defendants appeal virtually every aspect of the trial court's rulings. In addition, plaintiffs cross-appeal the treatment of certain claims. The issues fall into three general categories: liability and damages; class certification and claims; and interest and attorney's fees.

### I. *Liability-Related Issues*

According to defendants, the court committed legal and factual errors in imposing any liability upon them. The court held Martin, G & B and PVFA liable for violating three FLCRA provisions, by failing (1) to inform plaintiffs, in writing, of the correct terms of employment, §§ 2044(b)(2) & 2045(b); and (2) to provide the promised work, § 2044(b)(4). It also held PVF liable under § 2043(c), for dealing with an unregistered farm labor contractor.[5] As the lia-

bility of the other defendants partly depends on the court's findings concerning Martin, we will begin by examining their contentions as to him.

### A. *Martin*

■ Defendants first argue that Martin was exempt from the statute's coverage, under § 2042(b)(6), as a full-time employee of a registered farm labor contractor. This argument is nullified by the clear provision of the statute. The exemption applies only to the registration requirements. Although Martin did not need to register as a farm labor contractor, he was bound by all the other provisions of the Act. *See* § 2043(b).

■ They next contend that he received no "fee" for his services. This argument is equally unmeritorious. The Act defines "fee" to include "any money or other valuable consideration paid or promised to be paid to a person for services as a farm labor contractor." § 2042(c). The district court correctly found that Martin's salary constituted a "fee," for § 2042(c) purposes. *See Castillo v. Givens,* 704 F.2d 181, 197 (5th Cir.) (finding that crew leader's wage constituted fee), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983).

■ Defendants then claim that Martin is not liable to the plaintiff crew *members* because he had direct contact only with the crew *leaders.* This argument runs contrary to our case law. "[A] person may not insulate himself from the provisions of the

---

5. Enacted in 1963 and amended in 1974, the FLCRA was aimed at eliminating the abusive practices of farm labor contractors, the "middlemen" between the farmer-users and migrant farm workers. *See* S.Rep. No. 202, 88th Cong., 2d Sess. 1, *reprinted in* 1964 U.S.Code Cong. & Ad.News 3690, 3691–93; S.Rep. No. 1295, 93d Cong., 2d Sess. 3, *reprinted in* 1974 U.S.Code Cong. & Ad.News 6441–45; *see generally* Note, *A Defense of the Farm Labor Contractor Registration Act,* 59 Tex.L.Rev. 531 (1981). It should be construed broadly to effectuate its remedial purposes. *Almendarez v. Barrett-Fisher Co.,* 762 F.2d 1275, 1278–83 (5th Cir.1985); *Soliz v. Plunkett,* 615 F.2d 272, 275 (5th Cir.1980).

The Act defines "farm labor contractor" as "any person, who, for a fee, either for himself or on behalf of another person, recruits, solicits, hires, furnishes, or transports migrant workers ... for agricultural employment." § 2042(b). Such persons must register as farm labor contractors and comply with other requirements, including furnishing recruited workers with written copies of the employment terms, § 2045(b); correctly stating those terms, § 2044(b)(2); and actually providing the promised employment on the promised terms, § 2044(b)(4). Farmer-users may also incur liability if they deal with a farm labor contractor without ascertaining that the contractor is properly registered. § 2043(c).

Act by simply conducting his activities through underlings who deal more directly with the workers." *Soliz v. Plunkett*, 615 F.2d 272, 277 (5th Cir.1980).

Defendants last contend that two critical factual findings are unsupported by any "credible" evidence. We review the district court's factual findings under a "clearly erroneous" standard. Fed.R. Civ.P. 52(a). This standard

> recognizes and rests upon the unique opportunity afforded the trial court to evaluate the credibility of witnesses and to weigh the evidence. Because of the deference due the trial judge, unless [we are] left with the 'definite and firm conviction that a mistake has been committed,' [we] must accept the trial court's findings.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)) (citation omitted).

First, defendants challenge the court's finding that Martin actually recruited plaintiffs. Martin testified, they point out, that he lacked authority to enter into any "contracts" with crew leaders.

We need not decide whether Martin's offer and plaintiffs' acceptance constituted a "contract" or merely an enforceable promise under a promissory estoppel theory: the recruitment system may be *sui generis.* All of the testimony clearly dem-

onstrates that, due to his position, Martin's word carried the authority to send workers out into the fields to work either for G & B or, upon request, for other growers who were expected to pay for that work.

Plaintiffs all testified that Martin had recruited them and their crews to pick cantelopes in Presidio. In addition, Martin himself, in explaining his recruitment system, testified that he lined up willing workers from the lower Rio Grande Valley and then "[t]hey go to Presidio and contact them out there and they take care of [the details]." Depo. of G. Martin at 22; *see also id.* at 17–22, 43–44; T.R. 483. Bishop testified that G & B officers had told him that "if there was a need for people [in Presidio], let them know and that they would tell these people that there was a job out there if they wanted to come," Depo. of B. Bishop at 55; in fact, the three domestic crews from McAllen who regularly worked for PVF had contracted through G & B before coming, *id.* Furthermore, Martinez and Camacho testified, without contradiction, that Martin offered them jobs in Fort Stockton in July—the offer alone sufficed; there is no evidence that they were required to contact Fort Stockton growers in advance, but simply to show up there to work. In light of this evidence, we find no error in the court's decision to credit plaintiffs' testimony of their recruitment for Presidio.[6]

Based on this finding, the court determined that Martin had violated

---

6. In challenging plaintiffs' credibility, defendants rely heavily on G & B payroll records indicating that both Sanchez and Martinez had been working for G & B during and after the time they testified they were ready to leave for Presidio. The court implicitly found, however, that the records did not seriously impeach these crew leaders' testimony. With due deference to the court's opportunity to assess witness credibility, we conclude that the finding is not clearly erroneous.

According to the records, Sanchez worked no full days while he was assembling his crew and only a few hours with a crew of 12 after the scheduled departure date. D.Exs. 8–11. Martinez' crew worked only a half-day on June 9th, the day she testified she went to receive her departure instructions. Thereafter, the shifting

crews she led worked diminishing amounts, some days only a couple of hours, through June 19 when the records stop. D.Exs. 17–18.

The rest of their testimony was fully corroborated by the other crew leaders. To the extent their testimony is inconsistent with the records, the court could reasonably conclude that they had simply forgotten about the work in the five years between the events and the trial. It is not unlikely that plaintiffs, upon discovering that their alternate plans had fallen through, would take whatever work they could find on a day-to-day basis. The evidence indicated that growers in the lower Rio Grande Valley often hired day-to-day in mid-June because their harvests were winding down and workers were leaving for more profitable areas.

§ 2044(b)(4) (failure to comply with promised terms); and § 2045(b) (failure to provide written copies of the terms). We agree.

The § 2044(b)(4) violation clearly follows from the finding that Martin recruited plaintiffs; defendants do not dispute that, once the H–2 visas were issued, Presidio growers did not need domestic workers and could not have provided work even if they had come.[7] The § 2045(b) violation is equally clear. Plaintiffs testified that Martin gave them nothing in writing, and Martin himself admitted that he never gives crew leaders written copies of the employment terms.

██ Second, defendants challenge the court's finding that Martin misrepresented the terms of employment, by offering plaintiffs free housing in Presidio.[8] Mindful of the limited scope of our review, we conclude that this finding is not clearly erroneous.

All admit that almost no housing was available for workers in Presidio; the little housing that did exist was across the river in Ojinaga. Indeed, the growers' main difficulty in securing H–2 visas had been the non-existence of housing in Presidio. DOL would not approve the visa applications without first testing the domestic labor market, but no test was possible unless suitable housing could be offered.[9] *E.g.,* P.Exs. 3, 7, 14, 16, 20, 29, 32, 33.

It is also agreed that domestic farm workers will not go to an area without adequate housing. The crew leaders consistently testified that Martin's June offer

to them included housing, T.R. 229, 288, 343; Depo. of F. Camacho at 25; *see also* Depo. of J. Flores at 16; because of their responsibility to their crews, they would not have accepted the offer without assurances that housing would be available, *e.g.,* T.R. 255, 294–95. In addition, Martin testified that, when he first started recruiting in early May, no crew leaders were interested after he told them about the scarcity of housing.

Yet, according to Martin, Bishop and Brand, Martin was under great pressure to find workers for Presidio by late May and early June. *See, e.g.,* T.R. 490, 508, 566, 570, 616; Depo. of G. Martin at 16, 34 (finding workers was "high priority item"); Depo. of O. Brand at 25. He was repeatedly told to do whatever was necessary to get people out there to harvest the crops before they were ruined. The promise of housing, the court concluded, was a last-ditch gamble that, after traveling all the way to Presidio, plaintiffs would agree to live in Ojinaga. The evidence supports this conclusion. Martin's liability for the § 2044(b)(2) violation (misrepresentation of employment terms) plainly follows from this finding.

## B. *Vicarious Liability*

██ Applying agency principles, the court held G & B and PVFA jointly liable for Martin's violations.[10] Both defendants contest that holding because, they claim, the statute does not allow for "vicarious liability."

---

**7.** Both Martin and G & B· clearly knew about PVFA's concurrent negotiations with INS and DOL about the visas. Martin was present during at least one meeting between G & B officers and a Texas Employment Commission agent whom PVFA had contacted pursuant to its efforts to obtain visa approval. *See* P.Ex. 22. Moreover, G & B President Brand personally contacted several government officials to encourage them to issue the visas. *E.g.,* Depo. of O. Brand at 10–23, 36–44; Depo. of B. Bishop at 72–73; Depo. of W. Harris at 49–50.

**8.** It is arguable whether Martin also misrepresented the wages, promising $2.50 per hour in contrast to PVFA's standing offer of $2.20 per

hour. In light of Bishop's testimony that growers were willing to pay over $2.20 if necessary, we conclude that the offer of $2.50 did not constitute a knowing misrepresentation for § 2044(b)(2) purposes.

**9.** DOL H–2 visa regulations presume that domestic farm workers will not work in an area unless housing is available.

**10.** Although the Liability Order refers only generally to "vicarious liability," at the May 2, 1983 hearing, the court explained that the term meant "agency liability." *See* Transcript of Proceedings of May 2, 1983, at 20.

In accordance with the Act's distinction between farm labor contractors and farmer-users, we have refused to hold farmer-users vicariously liable for the recruiting violations of independent farm labor contractors. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1333–34 (5th Cir.1985); *see also Jenkins v. S. & A. Chaissan & Sons, Inc.*, 449 F.Supp. 216, 226–28 (S.D.N.Y.1978). G & B and PVFA are not farmer-users, however. Their liability is premised, instead, on the finding that they are farm labor contractors.

Neither case law nor the statute itself abrogates ordinary respondeat superior principles. As Martin's employer, G & B was responsible for all of Martin's actions within the scope of his employment. *E.g., De la Fuente v. Stokely-Van Camp, Inc.*, 514 F.Supp. 68, 79 (C.D.Ill.1981), *modified on other grounds*, 713 F.2d 225 (7th Cir. 1983); *cf. Soliz*, 615 F.2d at 277–78. G & B does not argue that Martin exceeded that scope in recruiting plaintiffs; its liability flows directly from Martin's.[11]

■ We find no support for the court's application of agency principles to PVFA, however. The record indicates that PVFA enlisted G & B's services as an independent contractor; as G & B's employer, PVFA is not liable for G & B's actions without some wrongful conduct of its own. *See Restatement (Second) of Torts* §§ 409–14 (1965), W. Prosser, *The Law of Torts* § 71, at 468–70 (4th ed. 1971). Yet the court made no specific findings concerning PVFA's participation in or knowledge of Martin's §§ 2044(b) and 2045(b) violations. Unless PVFA contributed to or had reason to know of Martin's misconduct, the blanket imposition of joint and several liability against PVFA cannot stand. We therefore vacate the judgment against PVFA and remand to the trial court for further findings.[12]

On remand, the court may also conclude that PVFA *independently* violated the Act. For example, the court has already found that PVFA's domestic recruiting activities, including the G & B connection that led to plaintiffs' recruitment, made PVFA a farm labor contractor within the meaning of § 2042(b);[13] this finding is not clearly erroneous, *e.g.*, P.Exs. 30–31, 38–43, 48; T.R. 610–16. PVFA was admittedly not registered, a possible violation of § 2043(a). The court may find other violations; we in no way attempt to substitute our judgment for that of the trial court.

### C. *PVF*

■ The court concluded that PVF violated § 2043(c), by relying on PVFA to meet its 1977 labor needs. Section 2043(c)

**11.** G & B also argues that it received no "fee" for Martin's services. This argument directly contradicts Othal Brand's testimony, however. Brand testified that, while the company paid Martin's salary, it always received some form of compensation when Martin supplied crews to a grower. *See* T.R. 571, 491–92, 506–08 (testimony of Martin). *Cf. De la Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 235 (7th Cir.1983); *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217, 1221 (7th Cir.1981).

**12.** There is no merit in PVFA's contention that Bishop's only contacts with G & B were in his capacity as PVF president, thereby relieving PVFA of liability for his acts. All of the evidence, including defendants' own testimony, indicates that the recruiting arrangement between Bishop and G & B encompassed the labor needs of all Presidio growers. According to both Bishop and Brand, their discussions focused on the labor crisis in all Presidio, not merely at PVF. *See* T.R. 490, 508, 566, 616; P.Ex. 22; Depo. of

B. Bishop at 67. Brand appeared at one of PVFA's June meetings with INS and even offered PVFA $250,000 out of G & B's coffers to build housing for workers in the future. T.R. 558, 561–2; Depo. of O. Brand at 23–24. Brand also told Martin to find workers for the whole area, *e.g.* T.R. 566; Depo. of G. Martin at 16, 34, and Martin told plaintiffs only that the work would be in Presidio, *e.g.*, T.R. 339–40, 527–28; Depo. of F. Camacho at 21, 26. Although Bishop no doubt included PVF in his request, he was clearly acting primarily as president of PVFA. *Cf. De la Fuente*, 713 F.2d at 236 n. 8 (for purposes of defendant contractor's liability, no distinction between plaintiffs recruited for defendant's operations and those recruited for others).

**13.** The court correctly found that the growers' dues constituted a "fee" for PVFA's recruitment services. Bishop testified that the dues were used to defray PVFA's recruiting expenses. *E.g.*, T.R. 629–30.

prohibits farmer-users from utilizing the services of an unregistered farm labor contractor. PVFA, through Bishop, acted as a farm labor contractor in recruiting plaintiffs; it is undisputed that PVFA was not properly registered. To affirm the judgment of PVF's liability, however, we would also have to find that Bishop's contacts with G & B were *exclusively* in his capacity as PVFA president. *Compare Presidio Valley Farmers Association v. Brock,* 765 F.2d 1353, 1357–58 (5th Cir.1985) (individual growers not liable for PVFA's violations despite unincorporated status), *cert. denied,* —— U.S. ——, 106 S.Ct. 833, 88 L.Ed.2d 804 (1986). We agree with defendants that the record does not support this conclusion.

Plaintiffs have offered no evidence that PVF's labor requests were funnelled through PVFA; indeed, the contrary inference is strong. G & B and Bishop were co-owners of PVF, with a compelling interest in the farm's economic being. This fact alone suggests that they would not have treated PVF's labor needs on a par with those of the other PVFA members. Finding no support in this record for this violation, we reverse the liability finding and corresponding award of damages against PVF.

### D. *Damages*

The court awarded $500 in liquidated damages to each plaintiff for each statutory violation. Defendants now contend that the award is too high because it exceeds the amount plaintiffs could have earned if they had actually gone to Presidio. This argument has no merit.[14]

 FLCRA relief need not be measured by actual damages alone. "[T]he purpose of this civil remedy is not restricted to compensation of individual plaintiffs. It is designed also to promote enforcement of the Act and thereby deter and correct the exploitative practices that have histori-

cally plagued the migrant farm labor market." *Beliz,* 765 F.2d at 1332. Under § 2050a(b), the court has discretion to award damages "up to and including an amount equal to the amount of actual damages, or $500, or other equitable relief" for each violation. In fixing the amount of the award, the court should consider numerous factors, including the nature of the violations, the extent of the defendant's culpability, the total amount of the award, the substantive or technical nature of the violations and the cost—in all senses—to the plaintiffs of bringing the suit. *See Beliz,* 765 F.2d at 1333; *Salazar-Calderon,* 765 F.2d at 1346–49.

Here, the record indicates that the court carefully considered these factors and determined that $500 was appropriate. *Cf. Washington v. Miller,* 721 F.2d 797, 803 (11th Cir.1983) (affirming maximum damages for nontechnical violations). Defendants have not shown this to be an abuse of discretion.

### II. *Class-Related Issues*

Defendants' litany of class-related issues divides into two main groups. They raise numerous issues pertaining to the certification itself and, then, challenge the claims of individual claimants. Plaintiffs' cross-appeal also involves the claims question.

### A. *Class Certification*

 First, defendants argue that suits brought under the FLCRA may not be handled as class actions. On the contrary, however, the class action device has frequently been approved in suits under the FLCRA. *E.g., Almandarez v. Barrett-Fisher Co.,* 762 F.2d 1275 (5th Cir.1985); *De la Fuente,* 713 F.2d at 231–32; *Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217 (7th Cir.1981); *Izaguirre v. Tankersley,* 516 F.Supp. 755 (D.Or.1981); *see also Salazar-Calderon,* 765 F.2d at 1350 (suggesting possibility of class certification on remand of FLCRA suit).

14. Defendants also suggest that the $500 award resulted from the court's belief that it had no discretion to award less than $500. This explanation for the court's award is belied, however, by the court's own remarks, which reflect complete awareness that the amount is discretionary. *See* Transcript of Proceedings of May 2, 1983 at 46.

Second, they contend that certification in this case is improper because the claims arise out of alleged oral misrepresentations. Such claims have been found unsuitable for class treatment when individual questions, such as reliance and damages, predominate over class questions. *See, e.g.,* Fed.R.Civ.P. 23(b)(3) 1966 Advisory Committee Notes.

The district court has great discretion in certifying and managing a proposed class action. *Kilgo v. Bowman Transportation, Inc.,* 789 F.2d 859, 877 (11th Cir. 1986); *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 471 (5th Cir.1986); *see Salazar-Calderon,* 765 F.2d at 1350. Where the court has determined that class certification is appropriate, we may reverse its decision only upon a showing of abuse.

The court acted well within its discretion in certifying this suit as a class action.[15] *See De la Fuente,* 713 F.2d 225 (FLCRA class action for violations of § 2045 (failure to disclose)). Despite defendants' characterization, the claims are for statutory violations. *Cf. Greenhaw v. Lubbock County Beverage Association,* 721 F.2d 1019, 1024 (5th Cir.1983) (class device appropriate "enforcing mechanism for congressionally sanctioned goals"). Moreover, due to the system of recruitment, the predominant liability questions are common to all plaintiffs. The job offers Martin made to the four crew leaders were, for the most part, identical; an offer to a crew leader extended equally to all of his crew. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2309, 72 L.Ed.2d 740 (1982) (class action "'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and ... 'turn on questions of law applicable in the same manner to each member of the class'") (*quoting Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 257–58, 61 L.Ed.2d 176 (1979)); *cf.*

*Alliance to End Repression v. Rochford,* 565 F.2d 975, 979 (7th Cir.1977) (common issues predominate in pattern-and-practice suit). Furthermore, the liquidated damages awards obviated any need to resolve individual questions of reliance and damages.

Third, defendants argue that the decision to certify, made three years after institution of the suit, was untimely. We disagree. Although the district court should make its initial ruling on class certification "[a]s soon as practicable after the commencement of an action," Fed.R.Civ.P. 23(c)(1), there is no set deadline by which the court must act. *See Gore v. Turner,* 563 F.2d 159, 165–66 (5th Cir.1977) (maintenance of class action possible even without explicit Rule 23(c)(1) determination); *see also Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc.,* 586 F.2d 962, 966 (2d Cir.1978) (precipitous action unnecessary). Part of the delay here is attributable to plaintiffs' post-filing discovery efforts; we find no abuse in the court's decision to await those results, *see Gore,* 563 F.2d 159; *Huff v. N.D. Cass Co.,* 485 F.2d 710, 712–13 (5th Cir.1973). Still more delay resulted from the docket backlog in Brownsville, over which plaintiffs had no control. Especially in light of the unusually timely filing of this case, we do not find that defendants were unduly prejudiced by the delay.

Last, defendants contest the adequacy of the class notice, claiming that it violates Rule 23(c)(2)'s requirement of "the best notice practicable under the circumstances." There is no merit at all to this claim. The rule requires only that notice be mailed individually to "all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d

---

**15.** Defendants also challenge the conclusory nature of the certification order. We agree that more detail would be preferable and, were the order all we had, might have remanded for greater specificity. However, we also have the parties' briefs, other orders and the trial record as well as transcripts of the numerous hearings. From these, it is clear that the court not only considered the Rule 23(b)(3) factors initially but also carefully re-evaluated them—and redefined the class—throughout the succeeding five-year period.

732 (1974); *cf. In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 178–79 (5th Cir.1979) (stressing trial court's great discretion over matters of notice and determination of class), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). By contrast, the court here not only required plaintiffs to mail individual notice in English and Spanish to all persons they could reasonably locate, it also ordered bilingual radio and newspaper announcements for a sixty-day period in the areas where class members were most likely to be found. In addition, over defendants' objection, plaintiffs personally contacted as many class members as possible. Given the mobile, semi-literate character of the class, these efforts fully satisfied the dictates of Rule 23(c).

## B. *Claims and Claimants*

Defendants' first challenge to individual claimants concerns two crew leaders, Martinez and Quintero, and any crew members who could not legally work in Presidio. These persons, they contend, are not included in the definition of the class.

■ This contention overlooks what the court did under its broad authority to redefine the class "as appropriate in response to the progression of the case from assertion to facts." *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). The class, as originally certified, did exclude crew leaders and consist only of "domestic farm workers," defined as United States citizens or aliens lawfully admitted to work in the United States.[16] In conformance with the evidence as the suit progressed, however, the court periodically exercised its discretion to restructure the

class. By final judgment, the class included each of the four crew leaders and all recruited crew members regardless of immigration status.[17] Defendants have not shown this to constitute an abuse of discretion. *See Kilgo,* 789 F.2d at 877–78 (no abuse in court's post-trial decision to expand class to include other members where additions simply conformed to evidence at trial); *cf. Holsey v. Armour & Co.,* 743 F.2d 199, 205 (4th Cir.1984) (no abuse in court's decision to allow two class members to intervene as plaintiffs after trial), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). For clarity, however, the judgment should be modified on remand to reflect the precise final definition of the class.

■ Defendants' next argument concerns the approval of awards to claimants who had either forgotten or never known the details of the Presidio job offers. These claimants, defendants argue, are not entitled to damages because they could have formed no adequate expectations about the promised employment.

This argument, like their earlier misrepresentation and damage arguments, suggests a fundamental misunderstanding of the case. Their liability rests on statutory violations, for which only liquidated damages, not actual damages, were awarded. Regardless of whether crew members expected wages of $2.50 or $2.20 for 8–hour days or 10–hour days in Presidio or the lower Rio Grande Valley, they all shared two basic expectations: the existence of work and the existence of housing. Defendants violated the Act primarily because their actions first created and then destroyed these expectations. Any claimant

---

**16.** The only claimant whose immigration status has been expressly challenged is Federico Meza. We note that, although his visa restricted him to work in the Brownsville area, he nevertheless would be included in the group of those lawfully admitted to work in the United States.

**17.** At the May 2, 1983 hearing, the court explicitly included Martinez and Quintero: "I am going to redefine the class to include [the crew leaders]." Transcript of Proceedings of May 2, 1983

at 22. The court also approved notice directed to: "Agricultural field workers in the Rio Grande Valley of Texas and Mexico who were offered jobs in May and June 1977 to harvest melons in Presidio, Texas, but who were not taken to Presidio," R. 989, *see also* Transcript of Proceedings of May 2, 1983 at 22–23, and barred inquiry into the immigration status of the people who responded.

who suffered as a result is entitled to the relief.[18]

Last, defendants challenge the grant of certain claims, specifically: (1) in the Camacho crew, some Camacho family members, Roberto Blanco, and Layda and Ramon Perez; and (2) in the Martinez crew, Rolando Palacios and Enedelia Pena. According due deference to both the magistrate and the district court, we find substantial evidence to support their findings as to (1) the Camachos: We see no inconsistency between Camacho's testimony and his family's claims. Although defendants object to the inclusion of Camacho's parents, for example, he expressly testified at trial that they were going; (2) Roberto Blanco: Despite defendants' interpretation of Blanco's testimony, a close reading reveals that his vagueness as to dates results from a linguistic confusion of March with May and June with July. We see nothing to contradict his repeated assertions, corroborated by his name on the original crew list, that he was ready to go with Camacho to work; and (3) Rolando Palacios: Martinez reasonably explained the omission of the trucker Palacios' name from her list,[19] and her trial testimony is not inconsistent. She stated that *she* was taking only the people, but was not asked whether any of the *people* were taking trucks.

On the other hand, the record currently provides slim support for the claims of the two Perezes and Enedelia Pena. Lucia Perez unequivocally testified twice that her husband and one child were not going; at the hearing, Camacho did not adequately explain the basis of their claims. Similarly, Martinez clearly stated at trial that she was taking only three of her children, none of whom was Enedelia Pena; her cryptic explanation at the hearing sheds no real light on the merits of Pena's claim. With the exception of these three people, however, we affirm the awards to the approved claimants and turn now to plaintiffs' cross appeal, which is directed solely at the rejection of certain persons who claimed to be members of the class.

Plaintiffs contend that no self-proclaimed crew member should be excluded from the class without being given an opportunity to substantiate his claim. We agree.[20] *See* H. Newburg, *Class Actions* § 4600 (1977); *cf. Greenhaw*, 721 F.2d at 1032–33 (no abuse of discretion in court's order requiring claimants to appear to substantiate claims). A few of the rejected claims, such as that of Santa Reyna and possibly those of Irene Jaramillo, Tomasa Jaramillo, George Luis Rangel, Eubin Gomez and Emilio Vargas, appear meritorious on the existing record. Beyond the information on the claims forms, we know nothing about most of the others. The crew leaders' lists, while strong evidence of class membership, should not alone serve as a basis for excluding any claimant who wants and is able to prove the merits of his claim. Accordingly, we remand, for further proceedings, the claims of the following individuals:

1. Aniceto Alonzo, Olga Garza, Guadalupe Olvera, Juan Olvera, Eloisa Quintero, Guadalupe Quintero, Jesus Quintero, Margarita Quintero,

**18.** We similarly reject defendants' contention that they are somehow relieved of liability because some crew leaders allegedly also failed to comply with the statute. The district court correctly determined that defendants lack standing to raise this issue.

Defendants also challenge the credibility of all of the crew leaders and suggest that we disapprove, on that ground, all of the claims of all of the claimants, particularly those in Martinez's crew and in the Jose Flores contingent of Camacho's crew. We have already substantially approved the court's findings in this extremely factual case; for the same reasons, we reject this credibility challenge here.

We further find no merit in any of defendants' challenges to the facial validity of the claims forms themselves.

**19.** Sanchez also testified that he had originally omitted truckers from his list. The lists contained "crew members" whereas the truckers constituted a separate category of workers.

**20.** We do not agree, however, that the burden of proof is "almost nil." Plaintiffs' cases refer to proof of the *measure* of damages whereas the issue here is each claimant's entitlement to—or the *fact* of—any damages. *E.g., In Re Plywood Antitrust Litigation*, 655 F.2d 627, 635 (5th Cir. 1981).

George Luis Rangel, Guadalupe Valdez (Quintero's list);

2. Angelica Cantu, Jorge Contreras, Eubin Gomez, Maricela Gonzales, Irene Jaramillo, Tomasa Jaramillo, Alfredo Montelongo, Layda Perez, Ramon Perez, Santa Reyna, Pedro Ruiz, Emilio Vargas, Rosa Maria Vargas, Aurora Villanueva (Camacho's list);

3. Vicente Gillian, Enedelia Pena, Jesusita Vasquez (Martinez' list); and

4. Jose Ismael Anaya, Maria Graciela Arriaga, Pedro Cantu, Raul Cantu, Rosendo Cantu, Jesusa Flores,[21] Jose Flores, Jr., Armando Fuentes, Pablo Lopez, Arturo Loredo, Elijio Loredo, Sr., Janie Loredo, Linda Loredo, Petra Loredo, San Juanita Loredo, Antonio Morales, Eliseo Silva, Juan Silva (Flores' list).

### III. *Other Issues*

#### A. *Prejudgment Interest*

The court entered its "Liability Order" in 1982, three years before final judgment. At that time, the court ordered that a kind of interim interest of 9% per year begin to accrue on the awards. Analogizing to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216 (1982), defendants now claim that "prejudgment interest" is barred on any liquidated damages award. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 715, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945).

We are not persuaded by defendants' analogy; the FLSA provision differs significantly from that of the FLCRA.[22] Nevertheless, plaintiffs are not entitled to interest, prejudgment, on their award in this case and, therefore, we reverse.

 Interest before final judgment is generally awarded to compensate a plaintiff fully for an actual monetary loss he has suffered as a result of a defendant's breach of an obligation. *See Rodgers v.*

*United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947). Its assessment furthers the purpose of making the injured plaintiff whole. *Cf. Illinois Central Railroad Co. v. Texas Eastern Transmission Corp.*, 551 F.2d 943, 944 (5th Cir.1977) (contrasting actual damages with penalties, on which prejudgment interest does not usually accrue). Thus, had plaintiffs chosen to recover actual damages, interest—from the date of breach—would no doubt have been appropriate. They made no real attempt to prove actual damages, however, but instead requested only liquidated damages— in an amount which no one argues is related to the actual losses suffered. Interest from the date of the order does not serve to make them any more whole. While we do not condone defendants' dilatory tactics, we find no legal basis for the court's hybrid interest award.

#### B. *Attorney's Fees*

The court awarded plaintiffs attorney's fees under Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon 1971), *repealed & replaced by* Tex.Civ.Prac. & Rem.Code §§ 38.001–006 (Vernon 1986). *Compare Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 137–38 (3d Cir.1984) (awarding attorney's fees for both FLCRA and related state labor law violations where state labor law provided for fee award). Defendants contest the legal basis for this award.

 We agree that an award under article 2226 was inappropriate on the facts of this case. Article 2226 authorizes attorney's fees in suits for common law breach of an oral contract. Here, only the four crew leaders pursued common law contract claims; the vast majority of attorney time may not be covered by the statute. More importantly, we do not find that the crew leaders "prevailed" on their contract claims. Despite the liability finding, the court concluded they had not established

---

**21.** The birthday of Jesusa Flores is partially crossed out, but it may read "1966." In that case, of course, she was ineligible to file a claim.

**22.** A plaintiff under the FLSA is entitled to both compensatory and liquidated damages whereas an FLCRA plaintiff may receive either one or the other.

any right to recover damages for these claims. Texas courts do not allow article 2226 awards where the plaintiff is not the prevailing party and has recovered no damages on his claim. *See James Holmes Enterprises, Inc. v. John Bankston Construction & Equipment Rental, Inc.,* 664 S.W.2d 832, 834 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). Accordingly, we vacate the award under article 2226.

 Plaintiffs clearly prevailed on their FLCRA claims, however. Even in the absence of a statutory provision,[23] federal courts may award attorney's fees to a prevailing plaintiff if the losing party has been guilty of bad faith. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Alvarez v. Longboy,* 697 F.2d 1333, 1340 (9th Cir.1983) (suggesting possibility of such an award in FLCRA case). The court here hinted that plaintiffs might be entitled to an award on a bad faith theory, but it did not rule on this alternate ground. As we cannot substitute our opinion for the trial court's, we remand the case for further findings. Defendants have not contested the amount previously awarded. Should the court determine that defendants' conduct justifies an award of attorney's fees, this issue, as well as the remaining claims, can presumably be resolved without further appeal.

## CONCLUSION

We reverse the judgment against Presidio Valley Farms, Inc., the judgment in favor of Enedelia Pena, Layda Perez and Ramon Perez, and the award of prejudgment interest. We remand the cause for reconsideration of the claims of the enumerated persons and for further consideration of the claim against Presidio Valley Farmers Association and for attorney's

fees. Otherwise, the judgment may be affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED.

EDITH HOLLAN JONES, Circuit Judge, dissenting:

While I concur in much of the majority's opinion, I feel compelled to dissent on two points. The most important point is the excessive nature of the judgment. The opinion of the majority neglects to report the amount of the judgment here awarded against the defendants. That judgment was in excess of $466,000 at the date of entry in April, 1985, making it by far the largest judgment ever awarded against farm labor contractors for violations of FLCRA.[1] The standards used by this court to test FLCRA awards, a comparison of awards in other cases for FLCRA violations, and the context of defendants' violations all overwhelmingly indicate that the district court exceeded the bounds of reason in its award of damages.

In *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317 (5th Cir.1985), this court noted several factors that should be considered in awarding FLCRA liquidated damages:

> Whether an award accomplishes this [deterrent] purpose, in addition to affording compensation, is determined by considering not only *the amount allowed to each plaintiff for each violation* but also *the total amount of the award, the nature and persistence* of the violations, the extent of the *defendant's culpability, damage awards in similar cases, the defendant's ability to prevent future violations of the act, the substantive or technical nature of the violations, and the circumstances of each case....*

765 F.2d at 1332. *See also Salazar-Calderon v. PVFA,* 765 F.2d 1334, 1347 (5th

---

**23.** The FLCRA does not itself provide for an award of attorney's fees. *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1336 (5th Cir.1985); *Alvarez v. Longboy,* 697 F.2d 1333, 1340–41 (9th Cir.1983).

**1.** Because this court reverses a portion of the judgment, the amount affirmed is actually $238,500 in statutory liquidated damages of $1,500 for each of 159 plaintiffs plus a possible award of attorney's fees. Even as modified, the judgment is several times larger than any comparable award I could find.

Cir.1985) (refusing to upset FLCRA damage award where "the district court supported its decision with factors that could properly be considered by it"). According to these cases, the district court is required to articulate the factors that lead to its statutory damage award.

A variety of factors must be considered, because FLCRA contains both "technical" and "substantive" regulatory features whose impact upon the plaintiff farmworkers may vary widely. The deterrent potential of the award must be tempered with consideration of its realistic effect upon the farmer or contractor. As this court suggested in *Salazar-Calderon,* the success of farmers and farmworkers along the Rio Grande is intertwined and mutually dependent. Overly punitive assessment of FLCRA awards could endanger the already precarious state of domestic agriculture and thus indirectly harm the very people FLCRA was designed to protect. 765 F.2d at 1347.

The district court in this case awarded each plaintiff the maximum statutory penalty ($500.00) on each of four FLCRA violations, three of which were technical in nature. Contrary to the statement in the majority opinion that, "the record indicates that the court carefully considered these factors and determined that $500 was appropriate," I find no written or oral statement by the district judge concerning the egregious size of the damage award. This fact alone should require remand for a reassessment of damages.

The only substantive FLCRA violation in this case is defendants' failure to comply with the promised terms of employment of the farm workers. 7 U.S.C. § 2044(b)(4). Although withdrawal of the offers of employment to the crewleaders is regrettable, it can hardly be denied that the facts underlying this violation were unique and not likely to be repeated. The Presidio Valley farmers were left hanging by the Federal Immigration and Naturalization Service while that federal agency dithered over whether to grant visas for seasonal non-immigrant laborers, who had always harvested the canteloupes in the past. Naturally, the farmers had to try to hire workers from any source in the event INS should deny clearance for workers from Ojinaga, Presidio's sister-city across the Rio Grande. This situation, which persisted within two or three weeks of harvest time, was desperate, requiring desperate measures on the part of Glen Martin and whoever else was recruiting for the farmers. Desperation does not justify failure to comply with the terms of employment, but it explains the need to hire domestic workers from the Valley and represents a unique set of conditions for the violation. Because of the INS-created turmoil, the "nature and persistence of the violations," a factor mentioned in *Beliz,* does not, in my view, weigh heavily against the defendants. Even if the substantive FLCRA violation warranted the maximum penalty, however, the district court failed to distinguish between it and two technical violations (failure to provide written copies of the terms of employment and the representation of free housing), and penalized the defendants the maximum amount for those as well. By appellees' own admission, the actual damages suffered by each class member could not have exceeded $500. Record at 736. Moreover, the record establishes that many if not most class members mitigated damages by working for Defendant Griffin & Brand when the Presidio employment prospect vanished. Yet, the district court made no attempt to explain why a huge dividend to the class was required to fulfill FLCRA's policy.

The award in this case dwarfs other FLCRA judgments. An award of $500 per plaintiff per violation has been made in only one other germane case [2], *Wash-*

---

**2.** Both *Espinoza v. Stokely-Van Camp, Inc.,* 641 F.2d 535, 539 (7th Cir.1981), and *Rivera v. Adams Packing Co.,* 707 F.2d 1278 (11th Cir.1983) also involved an award of $500 per plaintiff per violation, but these cases did so on the belief that FLCRA mandated this approach. This circuit has rejected this interpretation of FLCRA. *See Salazar-Calderon v. PVFA, supra.* However, like *Washington,* both of these cases involved flagrant, glaring FLCRA violations, the fact of

*ington v. Miller*, 721 F.2d 797 (11th Cir. 1983), but that case involved only seven plaintiffs and flagrant, uncontested, substantive FLCRA violations (housing in violation of health codes, failure to keep required records, failure to disclose terms and conditions of employment, and failure to provide itemized earning statements). Moreover, the total award is also unparalleled. *See Beliz, supra* ($200 per worker against the grower and $500 per worker against the FLCRA contractor; 21 plaintiffs [approximately $14,700]); *Salazar-Calderon, supra* ($15 per violation per class member, 5 violations, "over 150 persons"); *Washington, supra* (total FLCRA award approximately $17,000); *Alvarez v. Longboy*, 697 F.2d 1333 (9th Cir.1983) ($150 per plaintiff, 92 plaintiffs, total award: $13,800); *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217 (7th Cir.1981) (total award approximately $30,000); *De la Fuente, supra* ($100 per worker per season [approximately $115,000]).

The unaccountable disparity between the award in the instant case and those in other FLCRA cases is even more poignant because several factors suggest that the defendants should have received some leniency from the district court. As noted, the circumstances leading to the violation are not likely to recur. Unlike many FLCRA cases where the existence of substantive FLCRA violations was uncontested, *see, e.g., Washington, Rivera, Alverez*, liability was hotly contested in this case. Additionally, the record reveals that many of the plaintiffs suffered no actual damages from the defendants' conduct, as they were given other work by these defendants themselves.[3] The credibility of many of the plaintiffs' claims was also severely undermined by documentary evidence,[4] a fact that was noted by the district court.[5] No distinction was made between technical and substantive violations—both were penalized at the highest possible rate.[6] Nor was

---

which does not appear to have been seriously questioned. As such, they are distinguishable from a case such as this where factual culpability was hotly contested and where the majority of the violations were technical in nature.

3. For example, the Martinez crew worked for G & B in Mission, Texas from June 1 until June 19, a period that they would have been working in Presidio. The Sanchez crew also worked for G & B from June 2 until June 16.

4. Juanita Martinez testified that Glen Martin had offered her crew work in Presidio beginning June 9, 1977, that she and her crew had no work from the end of May until the beginning of July, and that she had actually assembled a crew and was ready to leave for Presidio on June 9. On cross-examination, however, she was confronted with payroll records, signed by Mrs. Martinez, that showed that her crew worked in Mission for G & B from June 1 until June 19. [Tr. 539 *et seq.*] Faced with this evidence, Mrs. Martinez claimed that she had made a mistake and that she and her crew were to go to Presidio on *July* 9, a date when the Presidio harvest would have been long over.

Crispin Sanchez testified that Martin recruited him and his crew during that last days of May for the Presidio harvest, that he spent the first two weeks of June without work, during which time he was getting his crew ready to go to Presidio, and that he was ready to go to Presidio on June 13. However, payroll records (BX 7–11) clearly show that he and his crew were

working for G & B from June 2 until at least June 16, seriously undermining Sanchez's claims that he was planning to go to Presidio and that he was getting a crew together at that time.

The Flores crew does not appear to have existed at all until the hearing on damages. There was no evidence that Flores even met with Martin, and thus there was no basis for the district court to hold that the Flores "crew" had any agreement with Martin. Plaintiff-appellees case on Flores is instead based on the testimony at the damages hearing that *Camacho* told Flores to get 20–25 workers together. As Camacho testified at trial that Martin asked him to get together 50–60 hands [Tr. 307], that he, Camacho, was planning to take 53 or 54 hands to Presidio [Tr. 313], and that the plaintiffs' original petition alleged that the Camacho crew was 55 workers, of which Flores was only a member, Camacho's later claim that he was going to take 75 workers, 50 of which were Camacho's and 25 of which were to be Flores', is so utterly contradicted by his own earlier testimony and pleadings as to render it unbelievable.

5. "I don't know that he [plaintiffs' attorney] wants to impeach her [Martinez] any more than she is already impeached." Tr. 547.

6. *E.g.* PVF was held liable to each plaintiff for $500 for using PVFA, an unregistered farm labor contractor. How plaintiffs were harmed by this violation is not known, and indeed, we have

there any finding (or, for that matter, any evidence) that any of the defendants were likely to violate FLCRA in the future unless some massive deterrent award was levied.

Unlike the district court in *Salazar-Calderon*, which "was careful to outline the considerations that guided it in determining [damages]," 765 F.2d at 1347, the district court's award here has no articulated basis. Perhaps that is because, tested by awards in other cases, it defies justification. Discretion can be abused, particularly if no attempt is made explicate one's exercise of discretion. It is no palliative, given *Beliz* and *Salazar-Calderon*, to conclude that the district court° was within its discretion when, for all that we know from the record, the court may have made his award because he disliked the defendants or their counsel. The district court's failure to discriminate and failure even to articulate the standards for its award cry out for revision.

My second disagreement with the majority lies in the scope of remand to reconsider PVFA's liability. The majority, correctly, finds no support in the record for vicarious liability of PVFA "without some wrongful conduct of its own." Remand to obtain findings whether PVFA contributed to or had reason to know of Martin's violations of FLCRA is therefore appropriate. The majority goes further than this, however, in opening for remand the question whether PVFA independently violated the provisions of FLCRA. Quite simply, the district court found no such FLCRA violation by PVFA, *and no party has raised that issue on appeal.* The district court's opinion and the parties' briefs discuss PVFA's liability only in terms of its vicarious responsibility for the acts of Glen Martin and/or Griffin and Brand. PVFA's independent culpability is thus being raised *sua sponte*, and without justification, by this court.

Because I firmly believe that the district court's damage award was irresponsibly punitive, I would Vacate and Remand. I would also decline to assist in making the plaintiffs' case on issues of PVFA liability which were not appealed. On these matters, I respectfully dissent.

found no legal basis to sustain this award. It is interesting to note than in *Salazar-Calderon, supra,* PVFA's failure to register as a FLCRA contractor was termed a technical violation that gave rise to liquidated damages of $15 per plaintiff. Yet, a nearly-identical violation was penalized at a rate 33 times higher by the district court in this case.